## No. 2351

## F. THUMM v. THE STATE.

1. PRACTICE—CHARGE OF THE COURT—MANSLAUGHTER—SELF DEFENSE.—
   Among the well established rules which, under our practice, apply to the charge of the court, are the following: 1. The charge of the court is always sufficient if it distinctly sets forth the law applicable to the evidence; and it is only necessary to give such instructions as are applicable to every legitimate deduction to be drawn from the facts in proof. 2. The charge must be tested by the evidence. 3. If, in homicide cases,

the issue of self defense is not *fairly* raised by the evidence, no charge upon that issue should be given. 4. In the absence of evidence tending to establish, or to raise a doubt, as to whether the homicide be of a lower grade than murder, it is unnecessary and improper for the court to charge upon manslaughter. See the opinion in extenso and the statement of the case for evidence *held* not to raise the issues of manslaughter or self defense; wherefore the omission of the trial court to charge upon those issues was not error.

2. SAME—THE DOCTRINE OF SELF DEFENSE, which applies to a defensive, and not an offensive act, and which is limited to necessity, and can not exceed the bounds of mere defense and prevention, will not avail a slayer who, by his own wrongful act, brought about the affray or produced the necessity for taking the life of the person slain, in order to protect his own life. In other words, if a person voluntarily engages in a combat, knowing that it will or may result in death, or some serious bodily injury that may produce the death of his adversary or himself, he can not claim that he acted in self defense. Note a state of case to which the rule applies. Note also that the evidence does not present the doctrine of imperfect self defense.

3. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Kendall. Tried below before the Hon. T. M. Paschal.

Appellant was indicted in Medina county, Texas, charging him with the murder of J. W. Hildebrandt in that county, on the twenty-second of June, 1887. The court, of its own motion, changed the venue to Kendall county. Trial was had there at the October term, 1887, resulting in a verdict of guilty of murder in the second degree, and punishment was fixed at a term of twenty-five years in the penitentiary.

Joseph Kempf was the first witness for the State. He testified that on the day of the homicide he was deputy to his son, August Kempf, who for three years had been district and county clerk of Medina county. Prior to the election to that office of August Kempf, the witness himself had held it for a number of years. Witness's general occupation was to attend to the duties of the county clerk's office. The witness knew the defendant, who, for about three years prior to the homicide, had been sheriff of Medina county. He also knew the deceased, J. W. Hildebrandt, in his life time. For two years prior to his death tne said J. W. Hildebrandt was a citizen of Medina county, but, having removed to San Antonio, in Bexar county, was a citizen of that county at the time he was killed. The plat now offered in evi-

dence is substantially a correct plat of the county clerk's office in Castroville, Medina county, Texas. It shows the hall of the court house and the front porch of the same, the sheriff's office and the assessor's office and the foot of the stairway which leads down from the district court room (up stairs) to the court house hall below. The plat is as follows:

Statement of the case.

Continuing, the witness Kempf testified that, at a few minutes past eleven o'clock on the morning of June 22, 1887, while he was sitting at his desk in the right hand corner of the clerk's office, furthest from the hall door, the deceased came in and asked for the records. Witness told him that the record books were in the vault where they were usually kept. He went into the vault and presently came out with one of the large record books, which he took to the desk in the left hand corner of the office furthest from the hall door. He placed the record book on that desk, seated himself in a chair, and proceeded to examine certain deeds recorded in said book. He sat at that desk with his back toward the witness and his side face towards the door. Witness was sitting at his desk with his full face to the door. About ten minutes after the deceased took his seat at the left hand desk, and while he was still sitting there, and while witness was still sitting at his desk, the defendant entered the clerk's office from the hall, through the hall door. He passed through the space between the table and the vault as shown on the plat, stopped and looked at witness for a moment, without speaking a word, and then approached the deceased from behind, in his usual gait, and began striking deceased over the head with his fist. Witness could not say how many blows defendant struck deceased with his fist. The blows were accompanied by a mumbling sound, but witness could not say which of the two parties made that noise, nor what, if anything, was said by either of the parties. When the defendant first struck deceased, deceased turned his head as if to look back and see what was the matter, and raised his hands as if to ward the blows off his head. He then attempted to rise from his chair, and partially fell between his chair and the window, which was at his right hand, whereupon the defendant seized a glass mucilage bottle from the window sill, with his right hand, which was a quart bottle and about half full of mucilage, and struck the deceased over the head, from behind with it. At about the second blow the bottle was shattered, but defendant continued to strike the deceased with that part of the bottle which remained in his hands, as long as he could hold it. This all transpired in a very few moments. The deceased finally succeeded in gaining his feet, and in a stooping posture went staggering towards the door which led from the clerk's office to the hall, the blood streaming from his face and side of his head. Defendant followed within two or three feet of deceased. When

the deceased reached the end of the table opposite the corner of the vault, as shown in the plat, he fell, but got up and staggered out of the office into the hall, through the front or hall door. Thence he turned to the left, towards the door of the hall which led to the porch, and disappeared from the view of the witness. Defendant followed the deceased closely until he, defendant, reached the door which leads from the office into the hall. Stopping at that door, with his body and feet inside the office, he rested his left hand on the inside facing of the said office door, and leaned forward his head, with his right hand hanging down by his side. He then had nothing in his hands. He turned his face to look towards the door which leads from the hall to the porch, towards which the deceased went a few minutes before, and at that time the witness heard the report of a pistol fired from the direction of the porch door. Defendant at once drew his pistol with his right hand, and, still standing in the position described by witness, fired a shot towards the front porch door. That shot was followed instantly by another shot from the direction of the porch door. Defendant then stepped into the hall and went towards the porch door. Witness retained his seat at his desk during the whole of the difficulty, which occupied but few moments. Deceased made no attempt whatever to strike the defendant while the two were in the clerk's office. On the contrary, he occupied himself in attempting to escape from the defendant.

The wall which divided the clerk's office and the hall was of solid stone, about eighteen inches thick. The deceased, standing at the front hall door leading to the porch, could not possibly have fired to strike the defendant's body in the position occupied by the defendant at the time of the shooting, though a shot fired from the porch door could have struck him in the head or on the arm, when he was leaning forward. After the shooting was over, the witness discovered blood upon the open record book from which deceased was making notes when attacked; and there was blood, mucilage and fragments of glass in the corner of the room where the striking was done. A trail of blood led from the desk in the left hand corner of the office to the point between the table and vault, where deceased fell as he passed out, and thence through the office door into the hall, and thence up the hall toward the front or porch door. There was the print of a bloody hand on the facing of the door at the point where the defendant rested his left hand at the time of the shooting. It

did not look like it was made from blood flowing from a wounded hand. No person other than witness, defendant and deceased was in the clerk's office at the time of the difficulty. District court was in session up stairs.

Cross examined, the witness said that he was neither reading nor writing when defendant came into the office. He was merely sitting at his desk facing the door, which was the only door leading into the office. Defendant did not speak to witness, and looked at him but a moment after he stopped on the floor before going over to the desk at which deceased was sitting. Deceased at that time was sitting with his back to witness, and his face to the wall, which threw his side face to the door, with the door a little behind him. After striking the deceased with the bottle until it was shattered, the defendant said nothing to deceased, nor did he do anything to deceased except to follow behind him as he staggered out of the office. Defendant could easily have struck deceased many blows as he retreated from the office, but refrained voluntarily, and permitted him to leave the office without further interference. The deceased was beyond the view of the witness at the time of the shooting, and witness saw nothing that was done except what was done, in the manner stated, by the defendant, at the office door. The distance across the clerk's office from the door to the back wall was twenty-three feet. It was some further from that door diago-nally across to the corner where the attack upon the deceased was made. The witness knew Mr. W. N. Parks, the county attorney of Medina county. He had no recollection of seeing Parks within a short time after the shooting, but he may have done so. He did not, however, make to said Parks any such statement as the following: "When the defendant came into the clerk's office on June 22, 1887, he started to the vault and then asked me where August was, and I told him I did not know. He then went over to where Hildebrandt was and said to him: 'Are you hunting up some more indictments against me?' Hildebrandt then jumped up and Thumm reached over and got the mucilage bottle and struck Hildebrandt over the head with it." The statement that witness ever told Mr. Parks any such thing was false.

Witness knew Mr. William Schweer, and may have met and talked with him on the porch of the court house on June 27, 1887, but he had no recollection of doing so. But if he did, he did not, in reply to Schweer's question about the killing, tell him

43

that "I was sitting at my desk in the office when Thumm came in and asked me where August was, and I told him that I did not know. Hildebrandt was then sitting at the other desk, and Thumm went to him and the two talked together. Then while they were talking Hildebrandt jumped up, and then Thumm hit Hildebrandt, and then Hildebrandt went out of the door of the clerk's office and into the hall of the court house, and then on to the porch or gallery, and went toward the window of the court house nearest to the porch, and I believe that Hildebrandt wanted to shoot through that window. Then Thumm stepped out of the clerk's office into the hall, and Hildebrandt then shot into the hall." Witness denied that he showed Schweer where one of the bullets pierced the wall near the front hallway door on the outside, and where another struck the wall near the hallway door on the inside. He denied that he showed Schweer how deceased went from the porch toward the window. He did not tell Schweer that he thought Hildebrandt wanted to shoot through the window. The statement that he told Schweer any such things was a lie. Witness declined to tell anybody what he saw and heard until he told it in court. Deceased said nothing to defendant after being hurt; he left the table at which he was sitting when attacked. Had he said anything, the witness, who was then but two or three steps distant, would have heard it.

Doctor William Boll testified, for the State, that he was called as a surgeon to attend Hildebrandt some ten or fifteen minutes before his death. Hildebrandt died from the effects of a gunshot wound. The ball entered the forehead near the roots of the hair, and penetrated the brain. There were three other wounds on the body. Two were contusions on the head, one made, evidently, by a heavy blunt instrument, and the other by a sharp instrument. Neither of these wounds contributed to the death of Hildebrandt, but must have dazed him slightly, for a short time. The remaining wound was a scratch on one knee.

Sam Lindley testified, for the State, that he was standing on the porch of the Medina county court house in Castroville, on the morning of June 22, 1887, when the fatal difficulty between defendant and Hildebrandt took place. Pingenot and Hornung, and some other parties whom witness could not now remember, were standing on the same porch at the time, to the left of witness, and nearer the window opening from the clerk's office than the witness was. Witness heard a noise in the clerk's office which prompted him to go into the hall, and to the door which

leads into the clerk's office. When he got to that door he saw Hildebrandt in the act of rising from the floor at a point between the table and the vault in the clerk's office, as shown on the plat in the evidence. Joseph Kempf was then near the desk in the right hand corner of the room, and defendant was standing near and in front of Hildebrandt, while the latter was trying to get up from the floor. Witness took in the situation at a glance, and left at once, passing rapidly out at the front door, across and from the porch, and to a point on the ground outside, and opposite the hall door. At this point witness turned and saw Hildebrandt as he reached the point in the hall within a few steps of the portico, where he put one of his hands to his head and made a remark which witness did not understand. Just as Hildebrandt reached the portico he turned suddenly, pulled his pistol, and fired down the hall way. Witness took about two steps to the left and heard two shots fired almost simultaneously, and saw Hildebrandt fall. Hildebrandt was in the doorway leading from the hall to the porch when he drew his pistol. He wheeled and fired just as he reached the portico. Hildebrandt died on the porch, and as the witness supposed, from the effects of the shot.

Cross examined, the witness said that when he stepped to the door and looked into the clerk's office and saw Hildebrandt on the floor, he observed that as much of his person as his head was under the table. He was then struggling to get to his feet, and defendant was standing in front of him. As the witness, leaving the court house, passed from the hall to the porch, August Hornung passed to a place on the porch to the right of witness. Witness at the same time saw Pingenot, who had gone about twenty steps in the direction of the gate. Witness did not look back into the hall until he got to the ground from the porch. Hornung was very little to witness's right when witness passed from the hall to the porch. He could not say where Hornung was when he turned and saw Hildebrandt coming from the hall to the porch. Hildebrandt was very near the porch door when witness turned. He was then in the act of pulling his pistol. He pulled and fired it very quick. He was not then standing quite erect. Defendant was not molesting the deceased when witness saw them in the clerk's office, nor did either of them speak a word that witness heard. There was nothing between Hildebrandt and the door to prevent him from going into the hall.

Ed DeMontel testified that he was a lawyer, and a member of the Castroville bar. The case of Volmar v. Ihnken was set for trial in the district court of Medina county on the morning of June 22, 1887. The deceased, who was the attorney for the plaintiff in that case, arrived in Castroville about fifteen minutes past ten o'clock on that morning. A short time after his arrival the witness observed him in the court room up stairs, leaning against the bar railing, talking to his client. The defendant was then sitting in his little private office in the court room, near the judge's bench. Defendant left his little office and walked to a point about one step beyond the deceased, when he stopped, turned his head towards deceased, and then wheeled and faced deceased for a moment. Neither defendant nor deceased spoke a word, and defendant presently walked back into the little office whence he came. Court had convened, but witness was not certain whether or not the judge was on the bench at the time. The deceased did not appear to notice defendant when the latter wheeled and faced him, but continued his conversation with his client. The witness could not state positively whether it was the deceased or Volmar that defendant looked at, defendant's back at that being towards witness. After the shooting was over, the witness went down stairs and found Hildebrandt lying on the gallery gasping and groaning.

August Hornung, assessor of Medina county, was the next witness for the State. He testified that, a little after eleven o'clock on the morning of June 22, 1887, he closed his office in the court house at Castroville and walked to the porch in front. He observed Pingenot and Nestor standing a little to the left. A few minutes after witness took his stand on the porch, his attention was attracted by a noise issuing from the clerk's office. He then saw Pingenot go to the window looking out from the clerk's office, and started to that window himself. On his way to the window he met Pingenot coming from it, saying something that the witness did not understand. Reaching the window, the witness looked through it and saw Hildebrandt standing with his back to witness, facing the defendant, and at this time he heard Hildebrandt, who had his hands up, say to defendant: "Please don't kill me." Defendant replied: "Yes, d—n you," and striking the defendant in the face with his fist, knocked him under the table at the end near the corner of the vault. Witness could not say positively that the blow knocked Hildebrandt under the table, but upon receiving the blow Hilde-

brandt fell, and was hidden from witness's view by the table. Witness took but a brief view of the situation through the window, and then walked rapidly to and across the porch, and to the post on the same which stands on the right going out from the hall. About the time witness reached the post he turned around and saw Hildebrandt step from the hall door to the porch, with his pistol in both hands. He turned to the right instantly and fired down the hall. Instantly, and almost simultaneously, two more shots were fired, and Hildebrandt fell. Witness stepped off the platform when Hildebrandt fired down the hall, and stood behind the porch post until Hildebrandt fell. Then, keeping himself screened from the door by the post, the witness walked to a point from which he could see Judge Joseph Kempf sitting with his arms in the window. Witness then crossed the porch and went into the clerk's office and found Judge Kempf weeping. Hildebrandt's first shot was fired as soon as he stepped about two feet beyond the hall door on the porch. The other two shots were fired while witness was stepping from the platform to the point behind the post. Hildebrandt's face was very bloody when he appeared at the hall door with his pistol in his hand. The defendant came to the hall door directly after Hildebrandt fell. A short time afterwards, the witness saw him standing in the hall, between the front hall door and the door leading into the clerk's office. As the witness went to the window, on first hearing the noise in the office, he saw Sam Lindley pass to his left. This witness testified substantially as did Judge Kempf about the blood in the clerk's office, and, in addition, that he found blood under the table where he saw defendant knock deceased down. Witness afterwards examined the porch under order of the court, but could find no blood nearer that edge of the porch towards the window than six or eight inches. That blood did not extend to the edge of the porch.

Cross examined, the witness said that Sam Lindley reached the porch about the time that witness heard the disturbance in the clerk's office. He did not see Pingenot on his (Pingenot's) way to the window, but saw him returning from it. The noise which attracted witness's attention sounded like chairs falling in the clerk's office. When that noise was made, Pingenot was nearer the window than the witness was. One of the blinds of that window was open and the other was partially open, the one nearest the porch being the open one. That window was about eighteen inches distant from the edge of the porch, and the sash was up.

Witness was about fourteen or fifteen feet distant when he heard deceased say: "Please don't kill me." Judge Kempf was some eight or nine feet off. Witness left the window in order to get out of the way of any danger that might arise. Not more than ten or twelve seconds intervened between the first and second shots. The sound of Hildebrandt's second shot blended with that of the shot fired from the inside, but witness could tell that two shots were fired. The shot from the inside anticipated Hildebrandt's second shot by a fraction of time. Witness testified on the habeas corpus trial of the defendant, and recognized the writing now exhibited to him as his testimony on that trial. That writing contains the following statement: "Hildebrandt could have gone to the east end of the porch before the first shot was fired, if he had slipped out. I mean, by slipped out, if he had gone out so I could not have heard him." By that statement witness meant to convey the idea that Hildebrandt could not have gone out without witness hearing him, unless he had gone out on his tip toes. Witness did not think there was time for him to have tip toed to the east end of the porch between the time he, witness, left the window and when he saw Hildebrandt rush out of the hall and turn and fire. Hildebrandt did not go to the window when he came from the hall to the porch, but when he reached the porch he turned and fired down the hall. There is no mistake about that fact. Witness knew Andrew Schuele, and may, on the day of the homicide, have spoken to him about it in front of the assessor's office, but he had no recollection of so doing. If so, he did not tell Schuele that he saw nothing of what happened inside of the court house, and only saw Hildebrandt shoot twice from the gallery. Witness and defendant were not on friendly terms.

L. G. Denman testified, for the State, that he was an attorney at law. Deceased was an attorney at law, but was not a member of witness's law firm, but owned a half interest in an abstract of land titles of which witness's firm owned the other half. Deceased moved to San Antonio from Medina county about two years before he was killed. About that time the defendant called at the office of witness's firm in San Antonio to see the deceased. From their conversation and actions on that occasion, witness took them to be friends, and understood from their interview that the deceased had transacted business for the defendant. Hildebrandt introduced the defendant and witness on that occasion. At the term of the Medina county district court suc-

ceeding defendant's visit to witness's office, witness saw the defendant and deceased meet on the streets of Castroville without speaking. Witness had often seen them meet without speaking since that time, one of those times being upon the trial of a case in the justice's court in San Antonio, in which case both of them were interested. They were, at the time of Hildebrandt's death, and for some time previous had been, bitter enemies. Deceased arrived in Castroville about ten o'clock on the morning of the fatal day, for the purpose of trying the case of Volmar v. Ihnken, which was set for that day, deceased being the attorney for Volmar. After some preliminary work and consultation among the attorneys, the case was continued, and deceased went down stairs. At that time witness was seated at a table up stairs with Judge Paschal and Mr. Slaton, preparing some bills of exception. He heard a noise down stairs, and some one said it was from a row which was in progress below. At first witness paid no attention to the matter, but when he heard pistol shots he got up and started towards the up stairs porch. Somebody remarked that defendant and deceased were the combatants, and witness went down stairs, and found defendant standing in the hall between the porch door and the clerk's office, looking towards the porch, on which Hildebrandt was then lying and groaning. Witness asked defendant who shot Hildebrandt. He replied "I did. He shot at me first, and I killed him." Defendant was then standing still, and was calm and self possessed, but pale. Witness then went to the porch and sent for a physician. Doctor Frisoni was then there, but witness did not then know that he was a physician.

A short time after this the witness saw the defendant standing in the court house yard, a few yards in front of the porch, talking to some of his friends. This was about thirty minutes after the shooting. Defendant would weigh about two hundred and twenty-five pounds, and was a strong, well made man. Deceased weighed about one hundred and thirty or thirty-five pounds, was about six feet tall, lean and emaciated, in bad health, and at that time was taking medicine for a throat affection. His left arm was so crippled that it was smaller than his right, and serviceable to him only in drawing things to him. Defendant was very bloody when witness met him in the hall, and had another substance besides blood on his coat and vest which looked like mucilage. Hildebrandt died about noon on the day of the shooting. His body was removed to the office of Mr. Thompson, in

the front part of the jail, which was the rear portion of the court house.

At about ten o'clock on that night, when the undertaker began to embalm the body, the defendant walked up to within ten or fifteen steps of the body, and for a short while watched the process of embalming. He was not then under arrest, was the sheriff of Medina county, and, no doubt, had a right to go to that place. After the body was placed in the coffin, witness looked at it and called the attention of the undertaker and Mr. Metcalfe to a slight wound over the left eye, his reason for doing so being that the report of the physicians did not mention that wound. After the shooting was over, the witness saw blood under the table in the clerk's office, opposite the vault. He also found the deceased's cravat in the clerk's office. He found one of the record books open on the desk in the left hand corner of the clerk's office, and near it, on either side, were some of the deceased's papers and an unfinished memorandum in his handwriting. There was blood on the record book. Court had not adjourned when the shooting took place, but the judge was at the table with witness and not on the bench. Witness could not say that there was any business at that time before the court which required the presence in the court room of the sheriff.

Celeste Pingenot, treasurer of Medina county, testified, for the State, that a few minutes after eleven o'clock on the morning of the fatal day, he closed his office and went to the porch of the court house, where he met Nestor and Hornung. Sam Lindley soon came up. After concluding a short business talk with Nestor, the witness heard a noise issuing from the clerk's office, which sounded like the falling of chairs, desks or books. The witness, who was the person on the porch nearest the east window of the clerk's office, stepped to that window and looked in. He saw Hildebrandt sitting in a chair and defendant facing him. Defendant's left hand and deceased's right hand were struggling, the one against the other, and deceased's left hand was raised as if to protect his face or head from a blow, while defendant's right hand, clasping what witness thought was a beer glass, but proved to be a bottle of mucilage, was raised in a striking attitude. Defendant struck the deceased two blows with the bottle, shattering it, and about that time the witness, having no desire to be summoned as a witness to this transaction should criminal proceedings ensue, left the window and attempted to get off unobserved. Recrossing the porch, the witness

met Lindley and Hornung, who appeared to be going either to the window witness had just quitted, or in at the hall door. Witness made no halt, and did not know where Hornung and Lindley went. Witness had gotten about fifteen steps away from the porch when he turned his head and saw deceased run out of the hall door, make one step on the porch, and wheel with his pistol in both hands and fire one shot down the hall. That shot was followed by two others, the reports of which were blended. The shot from the hall was fired a fraction of time before Hildebrandt's second shot was fired. Witness then saw deceased begin to fall, and crossed the street to a bar room.

On his cross examination the witness said that when he saw the deceased rush out of the hall, just before he fired his first shot, there was no other person within the range of his vision. He did not see either Hornung or Lindley on the porch at that time, but he was looking only at the deceased. A person might, without being seen by witness, have been on the outer edge of the porch, or on the outer corner of the same. Witness had made perhaps twenty-five steps from the window when he turned and saw deceased rush out of the hall door. If Hornung was on the porch at that time witness did not see him. A person in the county clerk's office could not see a man who, having left that office, had turned to the left in the hall, because of the intervening wall. A person standing in the door of the clerk's office could not see a man who, having gone from the hall to the porch, turned to the left, because of the intervening wall. A person standing at the left side of the clerk's office door, going in, could not see a man seated at the desk in the southeast corner of the office, because of the vault which intervened. He might see a man seated at that desk if he looked from the right hand side of the door going in, but witness doubted if he could. He thought a person would have to enter the clerk's office before he could see a man at the desk where he saw defendant and deceased from the east window. The sash and glass of the window through which he looked, he thought, were down. One of the blinds was open. The other may or may not have been closed. The witness neither saw nor heard Lindley pass over the porch after he (witness) left it.

August Kempf, clerk of the district and county court of Medina county, was next introduced by the State. He produced the suit of clothes which were worn by the deceased at the time of his death, a mucilage bottle, a little more than half filed with

mucilage, the fragments of a mucilage bottle, a forty-five calibre revolving pistol, which was taken from the porch near the body of the deceased, four forty-five calibre cartridges, a small vulcanized pistol scabbard, and some cuff and collar buttons, which, he testified, were the articles used in evidence on the habeas corpus trial of the defendant, and afterwards placed in his official custody. The bottle, a little more than half filled with mucilage would hold about a quart of that substance, and weighed about one and a half pounds.

Cross examined, the witness stated that between three and five minutes before the shooting he went from the district court room to the clerk's office. Passing the open door of the sheriff's office en route, he saw the back of a man sitting at the sheriff's table, in that office. Apparently the man was engaged in writing, but witness was not able to say that that man was the defendant. Court was in session at the time of the shooting, but the judge was not on the bench. He was at a table near the stand, with some lawyers who were preparing some bills of exceptions. Previous to the shooting the defendant was up stairs in discharge of his official duties. Two chambers of the pistol produced by the witness were empty, and four were loaded.

J. W. Hildebrandt, father of deceased, said that his son was a weakly child from the first, was never a strong, robust man. He was five feet eleven inches high and weighed from one hundred and thirty-five to one hundred and forty pounds. Was crippled in left arm, had had the elbow cap knocked off in a fight in 1883. He could use the arm to push with, but not to pull with.

The State rested.

James A. Slaton was the first witness for the defense. He testified that he was a lawyer and lived at Castroville. He was in the district court room at the time of the shooting. Court was then in session, but in recess, and witness was engaged with Judge Paschal in the preparation of a bill of exception. A row down stairs attracted some attention and remark, but witness did not go down until after the shooting took place. He and Judge Paschal then went down together. When witness reached the foot of the steps in the hall, he observed Mr. Denman a few steps in advance of him, and heard him ask the defendant, then standing in the hall: "Who did that!" Defendant replied: "I shot him; he shot at me twice." Denman went to the porch, and witness went with defendant into the office. When in his office defendant told witness that he had written an official letter to

Attorney General Hogg, and went into the clerk's office to get August Kempf to endorse it; but that August was not in. Defendant showed that letter to witness and he read it. The letter now shown the witness looked like the same, and its contents were about the same.

Cross examined, the witness said that he could identify the letter in evidence as the letter shown him by defendent only by the contents. Mr. Denman was in the court room a few moments before the shots were fired, but witness did not remember seeing him just at that time. Witness was not of counsel for defendant in this case, nor did he represent him on the habeas corpus or inquest trials. He did, however, ask some questions of witnesses on the inquest, and when the bail was fixed by the magistrate, he pronounced it exorbitant. Witness was a friend of the defendant and had acted as his attorney in other cases. At this point the defense put in evidence the letter referred to by the witness. It reads as follows:

"CASTROVILLE, TEXAS, June 22, 1887.

"*Hon. James S. Hogg, Attorney General, Austin, Texas:*

"DEAR SIR: Will you have the kindness to give me your valuable opinion on the following point: When a sheriff conveys an attached witness out of his county before a district judge, on a habeas corpus hearing, and the witness is too poor to give bond, and unable to pay his expenses out of his county, is the sheriff entitled to actual expenses for conveying such an attached witness out of his county?

"Your opinion will ever oblige

"Your obedient ser't.,

"F. THUMM."

Doctor Otto Frisoni, testifying for the defense, described the wounds on the person of the deceased substantially as they were described by Doctor Boll, and declared that the cause of death was the gunshot wound in the head, and that the contusions on the head did not in the least degree contribute to the fatal result. After describing the incised wound on the interior artery in the region of the temple, the witness said that the blood ejected from that wound would not fall at a greater distance from the feet of the wounded party than about two feet, and it would not fall in a straight line if the party were moving in a straight line himself, but, on account of the motion of the body, would fall

in a zigzag line after the fashion of a diagram made by the witness, which resembled a serpentine fence. The artery wound was not a serious one. Witness was standing on the gallery of his own house, one hundred and twenty-five feet distant from the court house, and saw the shooting of the deceased, having at the time an unobstructed view of the court house porch. Deceased came out of the court house hall door and went diagonally to the left, to a point near the window of the clerk's office. Witness saw him going from the window. August Hornung, at the time the fatal shot was fired, was on the ground, walking fast, and was about half way between the porch and either the front or the left hand gate of the court house yard. The location of the court house porch, fence, gates, and Frisoni's house is shown as follows:

Left Gate.    Middle Gate.    Right Gate.    Frisconi's House.

75 feet

75 feet

60 feet

125 feet

Porch.

Celeste Pingenot, at the same time was about half way between the porch and the front gate, going from the porch in a rapid walk.

On his cross examination the witness testified that he had been attending court since the day it convened. Part of his business was to exert what influence he had in behalf of the defendant, but he had other business at the court house. Witness did not consider the temple wound on the deceased a dangerous one, because it could have been instantly controlled by either of four different treatments. It was possible, the witness thought, but not probable, that if no attention had been paid to the temple wound, the deceased could have bled to death from it. Witness was examined on the habeas corpus trial of defendant. His written testimony as here exhibited represents him as testifying on that trial that had the temple wound been the only one inflicted

on deceased, and had no attention been paid to it, the chances of death by bleeding preponderated against the chances of recovery. No question, such as is implied by this statement, is asked witness, nor is it the one now answered by him. The question which called forth that answer was: "If a man out on a prairie should receive such a wound, and be without assistance, what would his chance of living be?" To that question the witness made the reply quoted, and would make it again. Witness, however, did not think that, had the temple wound been Mr. Hildebrandt's only wound, that he would have died, because he could have staunched the flow of blood himself.

W. N. Parks was the next witness for the defense. He testified, in substance, that he was county attorney of Medina county, and knew Joseph Kempf, who testified as a witness for the State on this trial. Witness, in the discharge of what he conceived to be his duty, went to the court house a few minutes after the homicide, and made a careful examination of the ground upon which the killing occurred. Hearing that Mr. Joseph Kempf was in the clerk's office when the difficulty began, the witness went to him, in his office, on the fatal day, and, among other things, Mr. Kempf told him that when the defendant came into the office he started to the vault, and then asked him where August Kempf was; that he replied that he did not know, and that defendant then went to where deceased was sitting and said to him: "Are you hunting up some more indictments against me?" That Hildebrandt then jumped up and defendant seized the mucilage bottle and struck Hildebrandt over the head with it. The witness did not communicate these facts to either the defendant or his attorneys until the Friday before this trial.

The porch of the court house was about eight feet wide and about twenty-two feet long. The blood lines on the porch extended from the hall door diagonally to the left and to the edge of the porch. These lines were not straight, but were irregular or zigzag. There was some blood on the ground below the edge of the porch. The blood line extended also along the hall from the clerk's door to the porch, and was straight but somewhat irregular. Witness's attention was called to what was said to be blood under the table in the clerk's office opposite the vault, and he examined it particularly, finding it to be mucilage and not blood. Witness also examined the blood stain on the door facing. It was on the middle facing—not the inside nor the outside facing—and was put there by rubbing, and did not get there by

flowing from the wound from which it came. He also examined the blood on the hall door that was shut. That on the inside of the said door was over three feet from the hall floor. That on the outside was two feet and nine inches from the porch floor. The porch floor was about two feet and nine inches from the ground. The window looking into the clerk's office from near the edge of the porch commences about four and a half feet from the ground. The bullet hole in the wall outside the hall door was about nine inches from the hall door on the left side going out; the bullet hole inside the hall, in the rear wall, was about thirteen inches from the right hand door facing. The rear hall door was about three and a half feet wide, and the hall itself about three feet wide.

On his cross examination, the witness said that he was a friend to the defendant, but had taken no other part in the defense than to testify to facts which came to his knowledge. He was aware of the facts to which he has testified at the time of the defendant's habeas corpus trial, but did not communicate them to the prosecution because the district attorney, Mr. Powell, and Mr. Denman and Colonel Green, the special prosecuting counsel, in taking charge of the case, ignored witness entirely, and did not advise with nor consult him. Feeling that he had not been treated with the courtesy due him in the matter, he kept his information to himself; and, for the same reason, when August Hornung testified on the habeas corpus trial that the discoloration on the floor beneath the table in the clerk's office was blood stain, he did not take the stand and disclose that the said discoloration was mucilage, and not blood stain. Moreover, the blood stains and impeaching evidence were defensive facts, and could not benefit the prosecution. Witness heard Mr. Denman telephone to the district attorney, and he, witness, then telephoned the district attorney that he need not come, as he, witness, could attend to the case, and he could have done so. The district attorney, however, did come, and he and Mr. Denman proceeded with the case, independent of the witness.

A. Bodeman, sheriff of Kendall county, testified, for the defense, that he was familiar with fire arms. The Hildebrandt pistol being placed in the hands of the witness, he testified as follows: "This is a forty-five calibre pistol. It is of single action, and will not cock and discharge itself by a pull on the trigger. It has to be cocked by hand manipulation."

Doctor Henkell testified, as an expert, for the defense, that he

had listened to the evidence in this case, and was of opinion: "1. That the pistol shot wound was the sole cause of Hildebrandt's death, the other wounds not contributing in the least degree to the fatal result. 2. The temple wound would not probably have caused death, even without surgical attention. If an artery bleeds constantly it does not bleed regularly, that is, it ejects blood irregularly immediately after the heart throb. The blood is forced out strongly and the jet reaches furthest; the flow then decreases until the next pulsation, and so it continues. The blood line from an artery, if the wounded party should walk straight and steadily, would be a zigzag line. The anterior temple artery (which was the one incised in this case), was classed as a small artery, and it would eject blood from the feet of a person standing erect not more than twenty-four inches. I am of opinion that the blood ejected from Hildebrandt's lacerated wound could at no time, if he stood erect, have fallen a greater distance from his feet than eighteen or twenty-four inches."

Andreas Schuele testified, for the defense, that, between two and three o'clock p. m., on the day of the tragedy, he met August Hornung in front of his, Hornung's office, and asked him how the trouble occurred. Hornung told witness in reply, that he did not see what occurred in the court house; that defendant and deceased must have had some trouble in the clerk's office; that he only saw Hildebrandt on the outside, holding his pistol in both hands, and saw him shoot from the outside into the hall, and that he shot twice. On his cross examination, the witness said that he told no one about Hornung's statement to him, until he saw Hornung's testimony on the habeas corpus trial as it was published in the San Antonio Daily Express; when he told Judge Thompson, the attorney for the defendant.

Nic Tshirhart testified, for the defense, that he was the jailer of Medina county, Texas, and had charge of the jail on the morning of June 22, 1887. Feeling unwell on that morning, he went to the sheriff's office to get permission to go off duty. He found the defendant in his office, engaged in writing at his table. Witness left at once for his home, which was about two hundred and fifty yards distant. He walked in his usual gait, consuming from three to five minutes getting home. He had just reached his house when he heard the reports of the pistol. He ran back to the court house at once, and found de-

ceased stretched on the porch, with Doctor Frisoni attending him.

William Schweer testified, for the defense, that he knew the State's witness Joseph Kempf. Between eight and nine o'clock on the morning of June 27, 1887, the day on which the grand jury reassembled, witness met Joseph Kempf on the steps of the court house portico, and asked him about the fight between Thumm and Hildebrandt. Kempf replied: "I was sitting at my desk in my office when Thumm came in and asked me where August was. I told him I did not know. Hildebrandt was then sitting at the other desk and Thumm went to him, and they talked together. Then, while they were talking, Hildebrandt jumped up, and then Thumm hit .Hildebrandt, and Hildebrandt went out of the door of the office into the hall, and then to the porch, and then towards the window of the clerk's office nearest the porch, and I believe wanted to shoot through the window; and then Thumm stepped out of the clerk's office into the hall, and then Hildebrandt shot into the hall." Kempf then showed witness the holes made by the bullets, one being in the wall near the front hallway door on the outside, and the other near the rear hallway door on the inside. He also showed the witness the way Hildebrandt went on the porch towards the window, stating that he believed Hildebrandt wanted to shoot through the window, and that Hildebrandt then turned and went back to the porch and shot into the hall. On his cross examination the witness stated that he did not report the facts to which he has testified, to Thumm or his attorneys, until after the habeas corpus trial, when he saw Kempf's testimony printed in a newspaper; when he reported it to his friend, Thumm.

The defense closed.

Messrs E. Digges, S. B. Easley, E. DeMontel and John Redus, testifying for the State, in rebuttal, said that they had never heard the reputation of Joseph Kempf for truth and veracity discussed, but knew it to be good. Redus and DeMontel testified also that the reputation of August Hornung for truth and veracity was good, although they had never heard his reputation discussed except when he was running for office.

The motion for new trial raised the questions discussed in the opinion.

*Walton, Hill & Walton*, for the appellant: It is claimed by appellant, and we think the testimony demonstrates it to be the fact,

that there were two difficulties, a first and second—the first commenced by appellant, but definitely ended—deceased reached a place of absolute and unquestioned safety, appellant having voluntarily, for a measured and measurable space of time, abandoned all violence and withdrawn from the difficulty; that then, deceased being in a place of safety, unpursued, out of sight of appellant, voluntarily returned to the presence of appellant and, moved by his own will alone, commenced an independent fight with deadly weapons when none had before been used, and, indeed, no effort made to use any.

The court under these facts refused to charge either self defense or manslaughter to the jury as the law of the case, but confined the finding to one of the degrees of murder.

We have not the benefit of the transcript and must rely on memory for the facts. Referring to the statement of facts, we state what we conceive to be the effect of the testimony as it came from the witnesses as they severally testified.[*]

There was but one witness present in the room at the first difficulty; three others, however, obtained, as they swear, a glimpse of part of the difficulty. There is considerable and irreconcilable conflict in the evidence, one line of which, taken as true, makes out the claim of appellant, plainly and irrefutably; while the other line, taken as true, weakens but does not destroy the claim.

Joseph Kempf, an old gentleman sixty-five years old, who bears a good character, was the witness in the room. It is true some witnesses swore to some contradictory statements made by him (of an important character), but the contradictions weighed nothing, one way or another, for the reason that the jury was not charged any law that called for their consideration by the jury. This witness was very hostile to appellant; but we believe he testified to what he thought was true, and to what he saw, as he remembered it.

We claim that if there had been no other testimony in the case but that of the witness, appellant, under the law, was entitled to a charge on both manslaughter and self defense. But this was not all the testimony.

Doctor Boll, Doctor Frisoni and Doctor Henckell establish material facts which it will not do to overlook:

---

The brief summarizes the testimony correctly as it appears in the record, but in reproducing the brief, the summary is omitted.—REPORTERS.

1.  The gunshot wound was absolutely mortal.

2.  It paralyzed the whole system instantly, both physical and mental.

3.  The wounds received in the clerk's office did not contribute to the death to any extent.

4.  Doctor Frisoni shows that the deceased went out on the portico, out of sight of appellant, and was coming from the window from which a view could be seen into the clerk's office where the original difficulty occurred, and in which he had left appellant when he came out. It shows further that the deceased was coming from the window where the blood lines in the diagram show uncontestibly he had been. There was a stone wall two feet thick between him and appellant, and he was then absolutely in safety, no one in pursuit, he having it in his power to go forward and thus continue to be in safety, or to return and come into danger, or rather to turn on his tracks and, not renew, but open up a new and independent fight with deadly weapons with appellant.

The witness Pingenot flatly contradicts Joseph Kempf in one particular, and explains another which Mr. Kempf did not see, or if he did see did not remember, or if remembered, did not tell, although directly questioned.

1.  That when Thumm was striking Hildebrandt they were fronting one another, and all the blows were not delivered from the rear of deceased. 2. The right hand of Hildebrandt and the left of appellant were locked.

These facts in themselves show a conflict—no matter the merits —there was a conflict and a contest, if this witness speaks truth. He was not attacked either in general character nor by contradictory statements. Hildebrandt was armed—this is not and will not be denied. What is more natural than to infer that, when appellant struck deceased with his fist, deceased reached for his pistol and the hand was grasped and held to prevent him from reaching it. We are not seeking to justify or excuse appellant for his original assault on Hildebrandt,—not at all. The assault was wrong in law, no matter what the object, purpose or intention of appellant was in making it—whether to provoke a contest and in it to kill, or in it to do some serious bodily harm, or merely to commit a simple and ordinary battery because of some real or fancied wrong done him by deceased. That is not the question; Hildebrandt was not struck wholly from behind, and there was a contest—a conflict between the parties. This shows that wit-

nesses, however honest, may not see all that occurs; and further, may think, and this honestly, that they saw something that did not occur, and which has no existence and never had; and it further shows the wisdom of the law that requires conflicting facts, when one view of them tends to ameliorate the degree of crime charged, shall be submitted to the jury under appropriate utterances of what the law is when applied to them—and this, too, no matter how impotent the testimony to prove an abstract or independent fact, when unconnected with the surrounding criminating facts and circumstances. The whole evidence should go to the jury that tends to elucidate a fact, and no phase of testimony should be let in that is not guided by appropriate charge of its law. A very little thing oftentimes operates as a key to unlock most abstruse and complicated mysteries, and gives the right path that leads through labyrinths of confusion.

The witness Hornung was contradicted by the witness Schuele, who said that at two or three o'clock on the day of the shooting he asked Hornung how the difficulty came about, and received reply: "I only saw Hildebrandt shoot twice. They must have had some trouble in the clerk's office"—or words to that effect.

The witness Lindley corroborates in one material respect that of Joseph Kempf in what occurred at the table. Kempf says Hildebrandt stumbled at this table and "sorter fell"—did not fall—caught on the table and recovered himself. This is evidently the movement seen by Lindley. Being from different standpoints, they were seen to an extent in a different light by the two. Hornung stands alone as to words and a blow at the table. The thing is so improbable, under the surroundings, that, in the light of what others saw, it is simply incredible.

Judge Denman's testimony establishes six facts: 1. That appellant and deceased were friends eighteen months or two years before the homicide. 2. About that time there was a rupture between them, and since then they had been enemies. 3. He was on the ground in a few minutes, and after the shooting he saw appellant between the clerk's door and the hall. He was pale, but did not appear excited. 4. Asked appellant: "Who did that?" (meaning, who shot deceased), and received reply: "I had to do it; he shot at me first." 5. Afterward, and before deceased died (he lived thirty or forty minutes after being shot), he saw appellant standing in the yard, some ten or twelve steps from the portico in the court house yard. He was then in company with P. B. Galbreath, a deputy sheriff. He appeared natu-

ral. 6. He again saw appellant, about nine o'clock at night, come within ten steps of where the body of deceased (at the jail) was being embalmed. He stood a moment or two and left; did not appear excited. The sixth fact proven by this witness was objected to on the ground that the time was too remote to give index to the intent moving to the killing—was therefore immaterial, and calculated from its very nature to prejudice the minds of jurors against defendant. We call attention to the bill reserving the point. We feel that this was hurtful evidence against our client, although it threw no ray of light on the killing.

With the testimony of Mr. Hildebrandt, the father of the deceased, the State closed its case.

The defense showed by the testimony of Mr. Slaton: 1. That the object of the defendant in going into the clerk's office was a legitimate one. 2. That he was not in pursuit of deceased.

Tshirhart's testimony identifies who it was August Kempf saw in the sheriff's office when he passed the door, a short time before the shooting. It also establishes the fact that appellant was quietly engaged in writing a little while before the first encounter in the clerk's office.

Doctor Frisoni's testimony shows that the witnesses Pingenot and Lindley were not in position to see what occurred on the portico, unless they had eyes in the back of their heads, while their own testimony shows they had little, if any, inclination to see what occurred.

The witness Schweers's testimony was a direct contradiction of the State witness Joseph Kempf. Schweers stands as well as any man in Medina county, had no interest in the case, and was no relation to the parties. He is to be believed; as much so as Joseph Kempf. This evidence going to the jury, and the law of the case charged, would have an appreciable effect. It indirectly corroborates Doctor Frisoni, and puts new life into the blood that led from the hall door to the edge of the porch, near the window. Joseph Kempf sat at a place where, if he had looked, he could have seen the movements of Hildebrandt on the portico. Did he look and see? Did he tell the witness what he saw, and then forget? This witness is corroborated, to an extent, by the next one.

Mr. Parks, the county attorney of Medina county, gave most of the data on which the main diagram is based. He was clear and full on these points. His testimony establishes three important facts: 1. There was no blood under the table. This fact

breaks into the evidence of Hornung and Lindley. If deceased was knocked under the table, blood would be there as a necessity; the artery was bleeding, and blood fell under the table if he was under it, for any length of time. So as to Lindley. If deceased was getting up at that table, there would have been pools of blood, or a pool of blood. There was no blood under the table; there was no pool or pools of blood about the table. So the facts fit back on the testimony of Joseph Kempf, that, after the last blow with the fragments of the bottle was delivered at the table, appellant was quiescent, and did not again molest deceased, by act or word, until after he was shot at by deceased, when he, deceased, had reached a place of absolute safety, and voluntarily returned from it to the presence of appellant, and opened an independent fight with deadly weapons, resort to which had not before been had.

2.    That deceased went out on the portico to a place of safety, and was in entire safety from appellant, who yet stood at the door.    The blood lines on the portico have an inaudible voice, but the fact they silently manifest is beyond dispute; they mark the going from the hall door to the left hand edge of the portico, from where deceased could see through the window into the clerk's office, where he had left appellant. They mark the return of deceased to the hall door, where he opened fire on appellant. They will not down—they can not be silenced—they can not be explained in any other way than that they were made by deceased as he went and returned. They were not sought to be explained—the task was hopeless. They are there, and could have been made in but one way, and that way was the one stated. The blood fell there and made the lines there as deceased went from and returned to the hall door. There is the line that marked the going—there the bloody drops on the ground as he stopped and looked, and there the blood lines that mark his return.

3.    The witness Joseph Kempf saw and heard more than he remembered. It is hard to believe that the county attorney would falsify; equally hard to believe the witness Schweers would do so, and hardly to be believed the witness Kempf would willfully do so. It is to be explained only on the hypothesis that the old gentleman saw, heard and forgot, but told to these witnesses what he saw and heard before he forgot. We think that it may be safely taken to be true that *something* did occur in the clerk's office between appellant and deceased of an angry nature before blows were resorted to. The sheriff of Kendall county

proved that the pistol used by Hildebrandt was a single action pistol; that is, it would not cock and then descend on the cartridge by pulling on the trigger, but the hammer had to be raised by hand and then the trigger pulled, to throw the hammer on the cartridge to explode the charge.

This evidence shows that after deceased fired the first shot he had to manipulate the hammer with his hand, to cock the pistol, to prepare for the second shot. Thus it is seen that deceased was not greatly stunned or dazed by the blow; and, further, that he knew very well what he was doing, and that his purpose was deadly: 1, he left the presence of appellant; 2, he gained safety; 3, he returned and opened a new fight; 4, he drew his pistol after he left appellant; 5, he reflected, considered and calculated; 6, he went to the window and looked into the clerk's office; 7, the appellant was not visible from that point, but was at the door; 8, deceased cocked his pistol and returned to the hall door, and, seeing appellant, presented his pistol with both hands and fired; 9, he recovered his pistol and re-cocked it, and again presented and fired. These facts can not be gainsaid, and they cut an important figure in this case.

Such is the case on the testimony. The question is: Did the court charge to the jury the law applicable to the facts? Of course no long argument nor intricate or learned discussion is needful here. Original reason of the common sense mind can answer the question in a jurisdiction where trial by jury to determine facts is a constitutional and statutory right. In such cases it is not the province of the court who presides to utter the law alone—to assume the existence or non-existence of facts where there is testimony that tends to establish a condition of things contrary to the assumption of the court. We use the word assumption in no offensive sense—directly or indirectly— but mean to say that where the court charges the jury to find only within given degrees of crime (if they find guilt at all), is an assumption by the court that facts are absent which would, if present and considered, justify a lower grade of crime than charged by the court.

We take it that, in view of the testimony in this case, there are two propositions of law that would have decreased the degree of crime found that were not given in charge, and that under the rule of common sense and the decisions of this court, they should have been given. The failure of the court to give them was an assumption on the part of the court that there was

no evidence tending to show—no matter how impotent it might be—that the ameliorating facts were not in evidence. That was a high assumption—an assumption that any frail man—(and all men are frail), should and ought to tremble to assume when the life or liberty of a citizen is concerned.

1. The law of manslaughter should have been given. It was not given, though asked by appellant at the trial. The attention of the court was directly called to the subject matter, and the query as to facts was asked to be put to the jury in a special instruction, which was refused.

The evidence on the trial was: 1. The parties were enemies. 2. A casual meeting occurred. 3. Appellant assaulted deceased with his fist when he (appellant), was armed, and could have used deadly weapons. Conceding for the moment and for the sake of the argument that the killing took place at a subsequent stage of this same difficulty—that there was no ending of it—but an actual, visible, indisputable continuation of it, until the fatal shot was fired—what then was the law of the case?

It will not be questioned that if the first blow had been with an instrument that would likely produce death, or certainly do serious bodily harm, then, other blows, or shots following, and death ensuing from the subsequent blows or shots (or the fist either), the killing would have been murder in the first or second degree; but if the difficulty was brought about for the sole purpose of administering an ordinary or simple battery, then, an emergency arising, the party making the assault being put in extremity and forced to kill to save his own life, the killing would be manslaughter only. Such we understand to be the rule of law, founded in reason, and upheld by the decisions of this court.

Permit us to restate the proposition: If a difficulty be provoked for the purpose of administering a simple or ordinary battery, and during the continuance of the conflict the party making the assault is put in extremity and kills to save his life, he can not put up self defense and justify himself, yet the killing will be manslaughter.

The material question on this branch of the case is, with what intention did appellant strike the first blow? 1. Was it to provoke and kill? 2. Was it to provoke and do great bodily harm? 3. Was it to provoke and commit an ordinary battery? This was question of fact on which the jury had to pass. It was a fact outside of the province of the court to affirm or deny! It was

not submitted to the jury. It was decided by the court, in that he refused to submit it to the jury, and in effect decided that the intention which accompanied the blow with the fist was the first or second of the above designs. (Howard v. The State, 23 Texas Ct. App., 279, and authorities cited; Hobbs v. The State, 16 Texas Ct. App., 517, and authorities cited; Niland v. The State, 19 Texas Ct. App., 166; McLaughlin v. The State, 10 Texas Ct. App., 340; Green v. The State, 12 Texas Ct. App., 449; Neyland v. The State, 13 Texas Ct. App., 550; Reynolds's Case, 14 Texas Ct. App., 435; Moore's Case, 15 Texas Ct. App., 1; Rutherford's Case, 16 Texas Ct. App., 649; Jones's Case, 17 Texas Ct. App., 603.) Other cases might be added, but these suffice; the last case is exactly in point. It is no longer an open question in this State.

1. If difficulty be provoked to commit simple battery, and extremity ensue in *that* difficulty, and death be inflicted by the party making the assault, to save his life, the offense is manslaughter.

2. If the assault be made under circumstances, or with such a weapon, as to leave in doubt the intention of the party making the assault, such doubt must go to the jury to solve, under appropriate charges of the court.

3. If there be any testimony which tends to establish manslaughter or self defense—no matter how impotent it may be—the court must charge the law of the case. The court has naught to do with the facts; to pass on them is the exclusive province of the jury.

I. The testimony in this case establishes: 1. The assault was made with the fist alone. If the blow made any perceptible mark, no witness testified to the fact. 2. Appellant was armed with a six shooter, and could have used it to shoot deceased, or as a bludgeon with which to beat him. He did neither, but used his fist. Such being the case, is there not a doubt about what appellant intended to accomplish or perform when he struck, which the jury alone was competent to solve; and does not the doubt involve, on the one hand manslaughter, and on the other a higher degree of crime? 3. The witness Pingenot swears that the left hand of appellant and the right hand of deceased were locked. What did that mean? What reasonable inference is to be drawn? Deceased was armed; what more natural than that the blow maddened and angered him, and he tried to draw and use his pistol; the right hand was caught, and in the then excitement and hot blood aroused, the mucilage bottle was brought

into play. 4. The original blow was with the naked fist, and some motive prompted the blow, and it was given for an object and a purpose, which object or purpose was matter for consideration of the jury, and not for the decision of the court. The court decided this vital question of fact, and to that extent deprived appellant of the right of trial by jury.

II. The court also failed to give the law of self defense. The law is that where a party provokes a difficulty—no matter the degree of injury that results, whether only an ordinary battery, serious bodily injury, lopping a limb or deprivation of life—there is no self defense, provided the injury be inflicted during that difficulty. But, if that difficulty shall commence, progress and end, and the party assaulted, after the ending, shall in turn become the assailant, then the party who made the assault in the first instance is by law reinvested with his right of self defense, and he may defend the same as if he had never been a wrong doer. The law of self defense was not given by the court, and when asked by appellant, was refused. That the rule we have laid down is the law in this State, we refer to White v. The State, 23 Texas Court of Appeals, 162, with authorities there cited. This case ought to have been cited on the last proposition, to show that the law presumes an intent and purpose moving every violent blow, and, further, that such intent and purpose, being matter of fact, must go by law, and under the law, for solution to that legal body which, under and by the law, has the right to decide the fact, and therefore determine the intent and purpose of the blow.

Referring to the case of Stoffer, as reported in self defense cases by Horrigan & Thompson, and as approved by this court, we have only to say that the law is that if A make an assault, no matter what his design, purpose or intent, he thereby forfeits his then right of self defense; but if he abandon the assault voluntarily, and, so far as he can, withdraw from it, and pursue it no further, then, if the party he assaulted, after A has ceased violence and ceased to pursue or strike blows, or try so to do, begin a new assault on his own account—then A is reinvested with self defense, and he may stand on it and there live or die. Is this the law?

If yes, then let us see what the facts are: 1. It is true that the difficulty occurred at the desk in the southeast corner of the clerk's office. 2. It had a commencement blow with the fist; it had a progress, blows with the mucilage bottle; it had an ending,

the assaulting party, of his own notion, voluntarily ceased to do violence when it was in his power to have continued; no one interfered. This is the evidence of one witness, of whose good character counsel on the other side said the angels in heaven were unhappy because they could not come down and be sworn and speak in his behalf. (About this, however, the writer has his doubts, and they are quite reasonable, too, he thinks.) True, another witness says there was a blow at the middle table, but, grant that what Hornung said is not a patent lie, then he and Joseph Kempf cross one another as to the fact, and the jury should judge.

3. Unmolested, undisturbed, unspoken to, unstricken, the deceased moved from the table through the room, out at the door, into the hall, out at the door on to the portico, some six or eight feet behind a two foot wall, into a place of perfect, absolute safety, and then, after time for reflection, to calculate, to determine, he turned on his track and went again into the presence of his late assailant, and voluntarily commenced a new and independent conflict with deadly weapons, and in the fight that ensued he lost his life.

It will not be denied—it can not be truthfully denied—that there is testimony to stamp as true every word of the case as stated. There is some evidence of a contradictory character, but who is to decide which witness told the the truth? Not the judge—God forbid such a travesty on right, justice and law. Suppose, however, we confess that it is true that Joseph Kempf swore falsely, and that Hornung is the artless truth teller, then we have the violence ended by voluntary cessation at the table, and naught else occurring until after reflection by deceased, and his determined, murderous shot was fired in vengeance, and not in self defense. Is the case not fairly stated? Is not one view of it fairly stated? Is not there evidence tending to show the case as stated? No matter how impotent, are there not facts in evidence that direct the mind to the state of case we have stated?

Did the original conflict end? Was there a new conflict? Was the conflict continuous from the assault at the table until the fatal shot? Was there a cessation? Who was the judge of these facts? The judge? No. The jury? Yes. Who decided—the jury? No. The judge? Yes. Where was the law when this farce was being played? It was under the feet of the court, being trodden on and stamped into the ground. (Jones's case, 17 Texas Ct. App., 603; Stoffer's case, Horrigan & Thompson's

cases of self defense, 218, and notes cited with approval in White's case, 23 Texas Ct. App., 154.)

In Stoffer's case it is said: "A conflict is the work of at least two persons, and when one has wholly withdrawn from it that conflict is ended, and it can not be prolonged by the efforts of him who remains to bring on another. It is very true that the original assault may have aroused the passions which impelled the pursuer to take vengeance upon his adversary; and if death should ensue from his act it might be entirely sufficient to mitigate his crime. But it would still be a crime. * * * * A line of distinction must be somewhere drawn, which, leaving the originator of a combat to the necessary consequences of his illegal or malicious conduct, shall neither impose upon him punishment or disabilities unknown to the law, nor encourage his adversary to wreak vengeance on him rather than to resort to the legal tribunals for redress, and we think upon principle and the decided weight of authority, it lies precisely where we have indicated. * * * * When he has succeeded in wholly withdrawing himself from the contest, and that so palpably as at the same time to manifest his good faith, and to remove any just apprehension from his adversary, he is again remitted to his right of self defense and may make it effectual by opposing force to force."

The doctrine here laid down is so consonant with common sense and right reason, that it seems to us utterly impossible to traverse it. A conflict must have an end; it can not be prolonged forever. If it be said that it continues beyond an absolute cessation—when the originator voluntarily abandoned the combat—when he is quiescent in the face of unlimited power to continue violence—and the assaulted party has left the presence of his assailant and has himself reached a place of quiet and indisputable safety—then truly there would be no end to the combat; but the original assailant would be an Ishmaelite, subject to be destroyed at any time in the future by the party he had at one time assailed. Such a doctrine can not be tolerated for a moment in a country where law and order govern the people.

If the original conflict in this case had not ended when the parties had separated themselves (and, certainly, it can make no difference who did the act of withdrawing, provided the other consented to, or did not oppose the withdrawal), and deceased had reached the portico, out of sight of appellant, then when would it have ended? The question answers itself. An end is

an end. A thing ends when it ceases—unless it be like a ditch, the oftener you cut off the ends the' longer it gets. Surely, it is not needful that we elaborate this point further. Logic, reason and every day common sense join hands, and in one voice cry out that the law in its power and purity has not been administered.

*W. L. Davidson,* Assistant Attorney General, for the State.

Willson, Judge. Notwithstanding the voluminous record in this case, there are but two questions of importance presented by it for determination. Those questions are: 1. Did the trial court err in omitting and refusing to instruct the jury upon the law of self defense? 2. Did it err in omitting and refusing to instruct the jury upon the law of manslaughter. The answers to these questions must be found in the evidence. The charge of the court is always sufficient if it distinctly sets forth the law applicable to the evidence; and it is only necessary to give such instructions as are applicable to every legitimate deduction to be drawn from the facts in proof. (Evans v. The State, 13 Texas Ct. App., 225.) The charge must be tested by the evidence. Where the issue of self defense is not *fairly* raised by the evidence, no charge upon that issue is required, or should be given. (Smith v. The State, 22 Texas Ct. App., 316; Wallace v. The State, 20 Texas Ct. App., 360.) In the absence of evidence tending to establish, or that creates a doubt, as to whether the homicide be of a lower grade than murder, it is unnecessary and improper for the court to charge upon manslaughter. (Willson's Texas Cr. Laws, section 1030; also sections 986 to 1070.)

Briefly but substantially stated, the evidence in this case is as follows: At the time of the homicide the defendant was the sheriff of Medina county, in the court house of which county the killing occurred. Deceased was a lawyer, a resident of San Antonio, and was in the court house of Medina county, attending to business in the office of the county clerk. Defendant and deceased were not on friendly terms. They were at enmity with each other. The cause of this state of feeling between them is not fully disclosed by the evidence, nor was it material that it should have been. Defendant is a large, athletic, physically powerful man, while the deceased was a small man, crippled in one arm. Deceased was sitting before a desk in the clerk's office, engaged in writing or in the examination of records.

There was but one other person in the office, an aged man, who testified as a witness in the case. Defendant went into the office, saw the deceased, the side of deceased being towards the door through which defendant entered the office. Upon seeing deceased and the old man, defendant stopped a moment, looked at the old man, then calmly approached the deceased, and without warning began striking deceased on the head with his fist. Deceased turned his head toward defendant and threw up his arm, as if to protect himself from the blows being inflicted upon him by the defendant. Defendant then seized a large mucilage bottle which was about half full of mucilage, and which weighed more than one pound, and with this bottle struck deceased over the head, continuing so to strike until the force of the blows shattered the bottle. Deceased, wounded, bleeding and staggering, fled from the room, defendant following him closely. Deceased passed out of the room door into a hall and thence on to a porch a few feet distant, drew a pistol, wheeled suddenly around and fired back into the hall which he had just passed through. Defendant, at the time of this shot by deceased, was standing at the office door, with his left hand upon the door facing, his right hand hanging down by his side, his head just outside the doorway, and facing in the direction of the deceased, and the remainder of his person inside the office. When deceased fired back into the hall defendant instantly drew his pistol, fired and killed the deceased, the deceased firing a second shot almost simultaneously with the fatal shot fired by the defendant. These are the leading facts of the case.

Do these facts fairly raise the issue of self defense? We think not. Let us apply the law to them. It is an elementary principle of the law that self defense is a *defensive,* not an *offensive* act, and must not exceed the bounds of mere defense and prevention. There must be at least an apparent necessity to ward off by force some unlawful and violent attack. It is a right based upon and limited by necessity. (Willson's Texas Crim. Laws, sec. 969.)

In this case, to our minds, the evidence shows that no such necessity as the law contemplates as a justification for homicide existed. Defendant was inside the room, protected by impenatrable rock walls from the shots of the deceased. Deceased was not advancing upon him, but was standing upon the porch, firing back into the hall. All that the defendant had to do to fully protect himself from the shots of the deceased was to with-

draw his head from the door.    This done and he was safe.    He had every advantage of the deceased.    He was cool and collected, armed with a six shooter, securely ensconsed in walls of stone.    His adversary was wounded, bleeding and excited, and could not advance upon or get a shot at the defendant without exposing himself to a fair and first shot from the defendant.

It is true that a person when unlawfully attacked is not bound to retreat in order to entitle him to the benefit of the plea of self defense.    But that rule can not be made applicable to the facts of this case.    It did not require retreat on the part of the defendant to place himself beyond the reach of danger from the deceased.    It required only a cessation of hostile pursuit of the deceased.    He had not ceased such pursuit.    He had not abandoned the attack; he was still following it up, but cautiously and coolly, evidently, as we think the facts show, hoping and expecting that the deceased in his bruised and half crazed condition, would, by some act, furnish a faint excuse for a fatal shot. He did not miscalculate the result.    He saw his opportunity, and with the coolness of a practised slayer he availed himself of it.    We fail to perceive from the evidence that any *necessity* for the homicide existed.

But, again, to one who brings on an affray or who prepares himself for an encounter in which he intends to wreak his malice, the plea of self defense is not available, though his own life be imperiled in the affray.    If a person by his own wrongful act brings about the necessity of taking the life of another, to prevent being himself killed, he can not say that such killing was in his necessary self defense.    A person can not avail himself of a necessity which he has knowingly and willfully brought upon himself.    (Willson's Texas Crim. Laws, sec. 981.)    If a person voluntarily engage in a combat, knowing that it will or may result in death, or some serious bodily injury which may produce the death of his adversary or himself, he can not claim that he is acting in self defense.    (Willson's Texas Crim. Laws, sec. 982.)

Apply these rules to the facts.    Defendant brought on the affray, and evidently with the intention to wreak his malice upon the deceased.    If any necessity arose for him to kill the deceased to protect himself from injury, that necessity was produced by his own willful and malicious act.    It is argued by his counsel that if he made the assault upon the deceased in the first instance with no intent to kill or to inflict serious bodily harm upon him, but with the intention merely to inflict upon him an ordinary battery,

he would not be wholly deprived of the right of self defense, but that, under the doctrine of imperfect or abridged self defense, he would not be guilty of a higher grade of homicide than manslaughter.

Without pausing to discuss the doctrine of imperfect self defense, we will dispose of the matter by saying that in our judgment it is not applicable to the evidence in this case. As we view the evidence, the defendant deliberately, and with a formed design to kill the deceased or to inflict upon him serious injury, which would probably result in death, made a violent, dangerous and brutal assault upon him. Even a battery with the fist of a man of his great physical weight and strength, inflicted upon an emaciated, feeble and crippled man, such as the deceased was proven to be, would be capable of inflicting serious bodily injury which might probably cause the death of the assaulted party. But, not content to use the greatly superior physical power which nature had endowed him with, he resorted to the use of a dangerous, if not a deadly, weapon, and with it inflicted blow after blow upon his helpless and unresisting victim. He used this weapon until it was shattered into fragments by the force of his ponderous blows. What intent was actuating him throughout this brutal assault? Was it merely to inflict an ordinary battery? It would be doing violence to the truth and to reason to so conclude. It is manifest to our minds from the evidence that the assault was made by him in the first instance with a deadly intent, with a heart regardless of social duty and fatally bent on mischief; with the purpose and formed design that such assault should result in the death of the man he hated. There is no room, it seems to us, for the impartial mind to reach any other conclusion from the evidence as to the intent of the defendant. We can not construe the facts so as to make them fairly raise the issue of even imperfect self defense. We are clearly of the opinion, therefore, that the court did not err, but acted properly in omitting and refusing to charge the jury upon the law of self defense.

This view of the matter disposes also of the question as to manslaughter. It is only upon the theory of imperfect self defense that manslaughter, in this case, could be predicated, and as imperfect self defense does not arise upon the facts, neither does the issue of manslaughter.

We have given to this case, and to each question presented by the record, thorough consideration. We have had the benefit of

able and exhaustive arguments and briefs from counsel for the State and the defendant. We have arrived at our conclusions not hastily, but deliberately and thoughtfully, and our undivided and mature judgment is that the conviction is in no respect erroneous, and should be affirmed; and it is so adjudged.

*Affirmed.*

Opinion delivered January 28, 1888.