Opinion delivered March 3, 1888.

---

No. 2514.

Jim Humphries v. The State.

Murder — Self Defense — Charge of the Court. — Upon a trial for murder, the trial court, at the request of the State, charged the jury as follows: "If you believe from the evidence in this cause that, at the

time the fatal blow was given, the defendant did not have reasonable ground for believing, and it did not so reasonably appear to the defendant, judging from his standpoint, that he was in danger of his life, or that serious bodily harm was about to be inflicted upon him by the deceased, then he can not be acquitted on the ground of self defense, but a killing under such circumstances would be murder in the second degree or manslaughter; and if the killing was done under these circumstances, then you will look to the definition of murder in the second degree and of manslaughter, as the same have been herein before defined, to determine the degree of guilt." *Held:* That, considered in connection with the charge as a whole, and in the light of the evidence, this instruction was correct.

APPEAL from the District Court of Rusk.    Tried below before the Hon. J. G. Hazelwood.

Under an indictment which charged him with the murder of Sam Atkinson, alias Sam Atkison, in Rusk county, Texas, on the twenty-fourth day of December, 1886, the appellant was convicted of manslaughter, and was awarded a term of three years in the penitentiary.

Sam Brewster was the first witness for the State.    He testified that he, the defendant, the deceased and Sam Hellum went to the town of Henderson together, in defendant's wagon, on the twenty-fourth day of December, 1886.    They started home late that evening, and at a point about two miles from town they overtook Mr. Strong in his wagon.    Defendant got into Strong's wagon, leaving deceased, witness and Hellum in the defendant's wagon, the deceased being then nearly drunk.    When they reached the foot of a hill three or four miles further up the road, the defendant called from Strong's wagon for the deceased and Hellum to get out of the wagon and walk up the hill.    Witness called back that deceased was drunk, and asked that defendant permit him to ride up the hill, witness proffering to get out and walk up the hill.    Defendant replied that such arrangement would not do, as he wanted witness to drive the wagon, and that deceased must get out.    Deceased got out of the wagon and staggered along the road.    He and defendant soon got into a dispute, and finally got to cursing each other.    They commenced to curse about the same time.    Defendant stood up in the wagon with a knife in his hand, cursing.    Deceased walked along the road, and finally waded a creek that had to be crossed, without stopping.    He got across the creek, but fell on the other side.    His hat fell into the creek and floated to a point

immediately underneath the wagon in which witness was then sitting. Witness had then stopped and the mules were drinking. Defendant, who was then standing up in the wagon behind witness, hallooed to witness to drive out, and witness did so. About that time deceased seized a piece of rail and stood holding one end in his hands and the other resting on the ground. Defendant sprang from the wagon in which he was riding, with his knife in his hand, and ran at the deceased. Deceased dropped the rail and fled, pursued by defendant, who overtook and cut him twice in the back and once in the arm. Witness then sprang from the wagon in which he was riding and caught the wrist of the hand in which defendant held the knife, and pulled him up the road in the direction in which the wagon had gone. After going a short distance defendant told witness that if he would go back and get his hat (which he had dropped?) he would abandon the row and have nothing more of a hostile nature to do with deceased. Witness then started back to get defendant's hat, and had nearly reached the place where it was lying when defendant again rushed towards deceased with his knife in his hand. Deceased then had nothing in his hands, but was going along up the road. The witness rushed past deceased and caught defendant and pushed him along up the road to the wagon, begging him to put up his knife and drop the difficulty. About this time deceased, holding in his hand a willow pole about four feet long, came to a point within eight or ten feet of where witness and defendant were standing, and said to defendant: "Jim, you cut me." Defendant replied: "Yes, and d—n you, I'll cut you again," jerked loose from witness, sprang forward and cut deceased in the breast. Deceased then dropped the pole and commenced backing. Witness then seized the willow pole and attempted to prevent the parties from fighting any more, by holding it between them. During this time deceased kept backing, and defendant advancing and cutting at deceased, witness holding the pole between them. Defendant then told witness that if he did not drop the pole and stop his interference he would cut witness. Witness then got out of the way, and the deceased turned and fled, pursued by defendant. He ran to a fence, and was just getting over it when defendant overtook him and stabbed him in the abdomen. Deceased fell from the fence to the ground on the other side, gasped or breathed three times and died. As he stabbed the deceased the last time, defendant said: "D—n you, take that." Witness and deceased

were brothers-in-law. Deceased was a somewhat larger man than defendant. It was the stab in the stomach, which penetrated to the hollow, that killed deceased. There were three other wounds found on deceased's body after death—two in the back and one in the arm.

T. J. McDonough testified, for the State, that he, Doctor Ross, Ed. Strong and Richard Ballinger left Henderson together, on the evening of December 24, 1886, to go to their several homes some miles up the Carthage road. When they had reached a point about seven miles from town, the witness saw several negroes, engaged, it appeared, in a fight. They were on the road about fifty yards ahead of witness when he saw them. He saw defendant, in pursuit of another negro, describe and retrace a circle in the road. The fleeing man had nothing in his hands, but Sam Brewster was holding a stick between him and defendant. Just as the parties crossed the road the last time, and just before the pursued man reached the fence, the witness saw the defendant make a blow, and at that time they passed out of his sight. When witness got to the parties, which was a few moments later, he found the deceased lying dead on the inside of the field, and defendant was making his way towards the wagons. Just as defendant got in his wagon, some person called to him to come back. He looked back over his shoulder, commenced whipping his horses and drove hurriedly away. Witness took but one drink on the day of the difficulty, and was perfectly sober when it occurred. During that day, and while in town, deceased came to witness to borrow a dollar. At the same time he told the witness that defendant owed him two dollars, and laughingly remarked that if defendant did not pay him, he would kill defendant.

The State closed.

Allen Strong testified, for the defense, that he was present and witnessed the fatal difficulty between defendant and deceased. When it commenced, the deceased was riding in the front, and defendant in the rear wagon. The fuss commenced by some one calling to deceased that defendant had treated several parties from his, deceased's, jug. Thereupon the deceased arose to his feet, in the front wagon, and proceeded to curse the defendant violently. A creek was then intervening between the two wagons. Deceased got out of the wagon, seized a rail, and said that he would get the defendant as he passed up from the creek, and would kill him before the sun rose again. Witness told de-

ceased to put the rail down, and not to strike, as his, witness's, mother, was in the wagon and he might hurt her. Deceased put down the rail, and witness saw that defendant had his knife out. He could not say that the defendant had or did not have the knife out when deceased caught up the rail. Witness then seized defendant, advised him against trouble with the deceased, drove on past the deceased for about seventy-five yards, and turned defendant loose. When witness released defendant, he, defendant, sprang off the wagon with his open knife in his hand, and started back towards deceased. When he reached a point about half way between the wagons, Sam Brewster caught him about the body, and began to push him back towards the wagon. Deceased then approached defendant from behind Brewster, and struck at defendant with a large stick, but missed him. Defendant then released himself from Brewster, and rushed at deceased with his knife, and the last witness saw of the parties, deceased had the stick and defendant his knife, the latter pursuing the former until they passed beyond the sight of the witness. They were then near the place where deceased died a few minutes later. Deceased was a large, powerful man, weighing at least one hundred and eighty pounds. The defendant was a small man, not exceeding one hundred and twenty pounds in weight.

Lida Moody testified, for the defense, that she and Jack Hall were together, going from Mr. Strong's house to that of Mr. Robinson, on the evening of the homicide, and en route, and about the time of the difficulty, met the defendant and deceased, and the other parties with them. They were traveling the main road from town. The first she saw of the parties Sam Brewster was pushing defendant along the road. Defendant and deceased were then cursing each other. As the party passed by witness and Hall, witness heard the defendant say: "Give me a living chance." Deceased seized a large stick and struck at defendant's head. Defendant dodged, and the blow fell on his shoulder. Deceased struck at defendant again, but the latter warded off the blow with his arm. Brewster then released defendant and deceased fled, pursued by defendant. Witness then saw defendant strike a blow at deceased as deceased fell over a low fence.

Doctor J. E. Ross testified, for the defense, that he left town with McDonough, Ed. Strong and Ballinger about three o'clock in the evening. Strong and Ballinger traveled together a short dis-

-tance behind witness and McDonough. The fight between defendant and deceased was just over when witness reached the scene. He saw the parties in the road ahead of him, but did not see the scuffling. When witness reached the scene of the conflict, Brewster asked him to get off his horse and examine the body of the deceased. Witness did so. He made but a hurried examination of the body of the dead man, and did not observe any wounds on the back and arm. There was a stab in the region of the heart, and another one, which was the fatal one, in the pit of the stomach. Witness saw Jack Hall, a negro woman, Sam Hellum and a negro boy on the ground.

Jack Hall testified, for the defense, that he was with Lida Moody on the occasion testified to by her. He saw deceased strike defendant on the shoulder with a large stick. Deceased then struck at defendant and missed him, and was preparing to strike at him again, when defendant broke loose from Brewster and cut deceased. The stick used by deceased was a large one, off which the bark had been peeled.

Sheriff Rogers testified, for the defense, that about three weeks after the homicide the defendant voluntarily surrendered to him. Witness had made three unsuccessful searches for defendant, and at the time of his surrender had two deputies out trying to apprehend him. Defendant executed bond and was released.

Ed Strong testified, for the defense, that he left Henderson on the fatal evening in company with Ross, McDonough and Ballinger. When he got near the scene of the killing he saw defendant, deceased and Brewster in the road, two of them evidently engaged in a scuffle and the other attempting to suppress it. Deceased appeared to be retreating, the defendant pursuing, and Brewster holding a stick between the two in an effort to prevent a collision. The parties fought across the road and back again, and then passed beyond the view of the witness.

The motion for new trial raised the question discussed in the opinion.

*W. W. Spivey* and *Buford & Hall*, for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. No errors are complained of upon this appeal except such as relate to the charge of the court. To the

general charge of the court no exception was reserved, and upon a careful examination of the charge with reference to the facts proved, we find no error therein which, in our opinion, was in the least degree calculated to injure the rights of the defendant. Several special instructions were requested by the defendant, all of which the court gave to the jury.

A special charge was requested by the district attorney, which the court also gave, and to the giving of which the defendant excepted and reserved his bill. It is this special charge that the defendant's counsel seem mainly to rely upon for a reversal of the conviction. It is as follows: "If you believe from the evidence in this cause that, at the time the fatal blow was given, the defendant did not have reasonable ground for believing, and it did not so reasonably appear to the defendant, judging from his standpoint, that he was in danger of his life, or that serious bodily harm was about to be inflicted upon him by the deceased, then he can not be acquitted on the ground of self defense, but a killing under such circumstances would be murder in the second degree or manslaughter; and if the killing was done under these circumstances, then you will look to the definition of murder in the second degree, and manslaughter, as the same have been hereinbefore defined, to determine the degree of guilt."

Viewing this special charge in connection with and as a part of the general charge, and with the evidence before the jury, we can perceive no error in it. In the general charge the jury had been fully instructed, and very favorably to the defendant, as to all the phases of self defense presented by the evidence, and it was right and proper that the State's theory of the issue of self defense should also be submitted to the jury. It was shown by the evidence of the State that, at the time the fatal blow was struck by the defendant, the deceased was fleeing from him, was unarmed, and that defendant was in no danger whatever, either real or apparent, from the deceased.

Finding no error in the conviction for which it should be set aside, the judgment is affirmed.

*Affirmed.*