# Court of Appeals.

June, 1888.

## PEOPLE v. LYONS.

HOMICIDE.—LAWS OF 1887, CHAP. 493.—WHAT CONSID-
ERED BY COURT OF APPEALS ON APPEAL IN CAPITAL
CASES.—EXCUSABLE HOMICIDE.—EVIDENCE OF PREVIOUS
QUARRELS BETWEEN DEFENDANT AND DECEASED.—DUTY
OF PERSON ASSAULTED.

Under the Laws of 1887, chapter 493,—allowing the Court of Appeals
in capital criminal cases to examine the record without regard
to whether exceptions have been taken to any decision of the
trial court,—a failure of the defendant in the trial court to
make objections and take proper exceptions deprives him of his
claim to a reversal by the Court of Appeals as a matter of right.
Under such circumstances he can only ask that court to deter-
mine upon the whole case the question whether justice requires
a new trial or not, or whether the verdict was against the weight
of evidence or against law. The court is then vested with power
in its discretion to disregard the neglect and review the case
upon the merits.

Upon a trial for murder it is proper to show that the deceased and
defendant had a quarrel, which was the beginning of their diffi-
culties, some three or four weeks before the homicide, which
difficulties finally culminated in the killing of deceased by
defendant.

A person assaulted and beaten should, if he has an opportunity to
do so, apply to the proper authorities for redress and protection.
He cannot take the law into his own hands, arm himself, and
go to the place where he expects to meet his former assailant
and inflict bodily injury upon him.

And if, while intent upon such purpose, he meets his former assail-
ant, and, before he is ready to fire the shot; and while the intent
still exists, he accidentally discharges his pistol and kills his
enemy, this homicide is not excusable.

Appeal from a judgment of the Court of General Ses-
sions of the Peace of the City and County of New York en-

tered upon a verdict of a jury convicting defendant of mur-
der in the first degree.

The indictment charged in the ordinary form that the
defendant on July 5, 1887, did willfully, feloniously, and of
his malice aforethought, make an assault upon one Joseph
Quinn by shooting the said Quinn and causing the death of
said Quinn.

The testimony in the case, which was of the most con-
flicting character, is sufficiently noticed in the opinion of
the Court of Appeals.

*Blake & Sullivan* (*Stephen S. Blake* and *Adolphus D.
Pape*, of counsel), for defendant, appellant.

I. There was no evidence whatever to justify a verdict
of murder in the first degree, for there was no testimony of
any intention upon the part of the defendant to kill, or of
any threat to kill. When he asked for the pistol on the
day of the shooting from one Neil, defendant, as he testified,
asked Neil for an unloaded pistol. He was assured that it
was unloaded, and when he pulled the trigger in the scuffle
with Quinn, he merely meant to frighten him; the conver-
sation after which the pistol was borrowed was merely a
casual one, and took place at the store of one Corr, and was
commenced by defendant telling Corr about the assault
made upon him by deceased on the previous day, and de-
fendant telling Corr that he wanted to go home every night
and live home, and remarking that if he had a pistol he
might scare some of them (referring to persons who had
annoyed him, and especially to Quinn).

II. The testimony for the people showed: First. That
the deceased was a trained athlete, a man of fine form, and
in a well-trained condition, while the defendant was a mere
boy in size, physique, and ability to defend himself by his
natural powers against a man such as deceased. Second.
The deceased on the night of July 4, 1887,—the night pre-
ivous to the shooting,—outrageously and brutally assaulted

and beat the defendant without the least provocation, raining down upon his head and face blow after blow with his fist and cane—the defendant not even raising his hand to defend himself against this athlete, and offering no resistance until the defendant fell covered with blood. Third. The deceased entertained a bitter animosity towards the defendant, and made threats to "do the defendant up" as often as he should find him around the corner, although he well knew that the defendant lived in Thirty-ninth Street, the immediate neighborhood, and must daily pass there.

We submit, therefore, that in view of the foregoing facts and circumstances: First, that the defendant was no match physically for the deceased; second, the frightful beating the defendant suffered at the hands of the deceased on the night of July 4, 1887; third, the repeated threats of the deceased that he would "do up the defendant," that "he would get a gold medal for killing him," that he was fully warranted in procuring a pistol, whether by loan or otherwise, for self-protection. See Trial of Selfridge (1806, Mass.), reported in *Wharton on Homicide.*

III. The defendant acted in self-defense.

Defendant was passing up Second Avenue in city of New York peacefully proceeding on his way to his home in the immediate neighborhood, molesting or interfering with nobody. The deceased stepped out from where he was standing, intercepting defendant's progress, stood right in front of him, and assaulted defendant. Considering the testimony of what took place at the meeting of defendant and deceased at which the killing took place, in connection with the brutal treatment he received from Quinn the night before, coupled with Quinn's threats to continue his assaults, and his declarations (which Lyons says he made at the instant), we say the defendant was justified in resorting to violence to defend himself. Was it Lyon's fault that he was attacked? Did he provoke Quinn at that instant? Did not Quinn advance toward him? We say yes, to all questions. How did Lyons know what Quinn would do, or

to what extent he would carry his assault? Lyons was in dread of his threats; he complained of them to Corr. When he pulled the pistol he had grounds for the apprehension of violence. The case comes within the rule of Shorter *v.* People, 2 *N. Y.* 193; 51 *Am. Dec.* 286, "that when one, who is without fault himself, is attacked by another in such a manner or under such circumstances as to furnish reasonable ground for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, I think he may safely act upon appearances and kill the assailant if that be necessary to avoid the apprehended danger."

The evidence fully warrants the conclusion that the deceased was on the watch for defendant, intending to carry out his previously expressed threat of "doing him up" when he should catch him on the corner.

Section 205 of the Penal Code makes homicide justifiable when committed in the lawful defense of the slayer, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great bodily injury to the slayer, and there is imminent danger of such design being accomplished. Lamb *v.* People, 54 *Barb.* 342; Evers *v.* People, 3 *Hun*, 716; affirmed in 63 *N. Y.* 625; Patterson *v.* People, 46 *Barb.* 625; People *v.* Austin, 1 *Park.* 154; Shorter *v.* People, 2 *N. Y.* 193; 51 *Am. Dec.* 286.

IV. The court was in error in permitting a witness, over defendant's objection, to testify about a quarrel which took place between defendant and that witness long before the shooting. The question was immaterial, irrelevant, and incompetent. It could mislead the jury into believing that defendant was of a quarrelsome disposition, and it was further objectionable in attacking his character before he made any effort in his defense.

V. It was error for the court to charge that "the conflict which occurred between him and the deceased, on the

night of July 4, when these injuries inflicted had ended; hours had elapsed between the assault and infliction of the injuries by the deceased upon the defendant when the homicide occurred. If any wrong had been done to him, if he had been assaulted, as he claims he was upon that occasion and unjustly beaten and ill-used, it was his duty to apply to the public authorities, to resort to the law for redress if he had an opportunity to do so, but he would have no right to arm himself and to go to the place where he expected to meet the man who had wronged and ill-treated, and inflicted any bodily injury whatever upon him."

This cannot be the law, for it wipes out the right of self-defense. Lyons, under this ruling, would have to submit to punishment unjustly for violating Quinn's instructions as to when and where he could go, and no matter to what extent Quinn saw fit to carry his violence, and unless defendant had called upon public authority for protecfion, he would have to submit to Quinn's assaults without the right of protecting himself. The failure of an assailed party to seek the protection of the authority does not deprive him of the right to defend himself in the same manner as if he had done so. Evers *v.* People, 3 *Hun*, 716; 63 *N. Y.* 625.

VI. The defense was two-fold; first, that the homicide was committed in self-defense; and second, that it was accidental. The evidence admits of this two-fold aspect. On the second point it was clearly shown that defendant believed the pistol to be unloaded, and that he only intended to frighten Quinn.

VII. The examination of the defendant as to his conduct and in years gone by was error. It had no bearing upon the charge, and may have prejudiced the jury so as to induce them to convict upon insufficient evidence. People *v.* Crapo, 76 *N. Y.* 288; 32 *Am. Rep.* 302.

*John R. Fellows*, district attorney (*B. F. Dos Passos*, assistant), for the people, respondents.

PECKHAM, J.—This is an appeal from a judgment of conviction of the prisoner of murder in the first degree, in the Court of General Sessions for the county of New York. The prisoner was indicted for the murder of one Quinn in August, 1887, in the county of New York. He was tried in the General Sessions before the recorder, and having been duly convicted and sentenced to death, his counsel appealed from such judgment to this court, under the act permitting such appeal, known as chapter 493 of the Laws of 1887.

It is claimed on the part of the defendant that the evidence does not show the defendant guilty of murder in the first degree; and, under the act of the legislature above mentioned, this court having the right to examine the record and determine upon the whole case whether the verdict was against the weight of evidence, or against law, or if justice requires a new trial, we are asked to make such examination in this case, and to reverse the judgment on the ground above mentioned.

The case being one in which the only judgment to be pronounced upon conviction under the indictment, is that of death, an appeal from such judgment makes it the duty of this court to examine with very great care and attention the whole record for the purpose of discharging the duty imposed upon us by the legislature and determining whether upon that evidence justice does require a new trial. In making that examination for the purpose of such a determination, the statute says it is not necessary that an exception shall have been taken to any decision made by the court below. Still, as has been already said by this court, a defendant under this statute cannot here claim as matter of right the benefit of errors occurring on the trial, where no proper objection was made and no exception taken to the decision of the court below. Such failure to make an objection and take proper exception, deprives the defendant of his claim, as matter of right, to a reversal of the judgment. Under such circumstances he can only ask that the court will determine upon the whole case the question whether

justice requires a new trial or not, or whether the verdict was against the weight of evidence or against law. The court is then vested with power, in its discretion, to disregard the neglect and review the case upon the merits. People *v.* Driscoll, 107 *N. Y.* 414.

Having the power, we have exercised it in this case, and have examined fully and carefully the whole record, and we are clearly of opinion that the verdict was not against the weight of evidence or against law, and that justice does not require a new trial. On the contrary, we are fully convinced that the defendant was treated with eminent fairness throughout the whole trial, and that the verdict is in accordance with law, and that a new trial should be denied.

Not because we have any doubt upon the question, but simply because it is a capital case, we think it proper to state the facts which we think the jury would have been well justified by the evidence in finding in this case.

The defendant is a man between twenty-five and thirty years of age, a resident all his life of the city of New York. The deceased was also a resident of the same city, and had been all his life, and was a young man of rather above the ordinary height, and, as the evidence tended to show, something of an athlete. Sometime in May, probably the 30th, 1887, the deceased, the prisoner and some others, including two or three young women, went to a picnic at the upper end of the island, at which there was dancing.

While there, there was some disturbance among this party, and something like the commencement of a quarrel between the deceased and the prisoner, the deceased demanding of the prisoner that he should apologize for some words which he had spoken of one Meehan, who was a companion of the deceased. The defendant refused to do so, and said that he would not take water from him even if he was a wrestler. The whole party were finally put out of the ground, and from that time until the 4th of July, there is no particular account of the relations existing between the prisoner and the deceased.

On the 4th of July the same parties met, either just prior to their going to a bathing-place in the upper part of the town, or at such bathing-place, and there they all had a bath. From the testimony of the women it would appear that all the women were drinking freely and the men of the party were partners in the same business. They wandered up and down through the town between the bathing-place and Thirty-sixth, Thirty-eighth, and Fortieth streets and Second avenue, going into various saloons and taking various drinks and loafing about until the evening of the same day. The party then separated for a short period. The same evening the deceased and the defendant again met in a saloon where the defendant and one of the women were drinking, and the deceased, being on the outside, sent some one in to the defendant and asked him to come out, which he did; and then, according to the evidence, Quinn took exception to something which he said the defendant had remarked in regard to his (Quinn's) conduct, and although the defendant denied having made the remark, the deceased nevertheless assaulted him, first with his open hand and then with a bamboo cane which he carried, to such an extent as to quite severely cut his face, blacken his eye and cause the blood to flow freely down his face and over his clothing. The severity of this assault is variously described by the witnesses, some making it an exceedingly gross and desperate assault, others making it of a much less savage nature; but all agreeing that the defendant was assaulted and struck with the hand and cane of the deceased, and that his eye was blackened and his face bloody from the effects of the assault.

It is agreed also that the defendant made no resistance to this attack, but endeavored to get out of the way of the deceased. After the assault was over, the defendant met one of the girls and said to her : "You were right after all; you had me done up by Quinn this afternoon." To which the girl replied : "I hope you don't think I had you done up." This was the same evening of the assault and a short time

after it occurred. Evidence was given upon the trial that the defendant that same night made threats in regard to the deceased and said he would get "hunk" with him, and one witness testified that he said he would put a bullet in him the next time he saw him. Others testified he said, "he did me to-night, but I'll do him the next time I see him," or "I'll do him to-morrow," or "he did me to-night, and I'll do him when he has his friends and I have mine."

The next day, July 5, the defendant was not at work, but met a companion with whom he walked through the streets of the city, and they finally went to a saloon about 2 o'clock P. M., where the bar-keeper was a brother of the companion with whom defendant was walking. Defendant asked him if he had a pistol, and the bar-keeper, seeing his brother, who was behind the defendant, shake his head, told the defendant he had not, it was at home and broken. About this time another companion came into the saloon and asked the defendant where he got the shiner (meaning the black eye), and defendant told him that Quinn had given it to him the night before and threatened to do it every time he came around that corner (being the corner of Second avenue and Thirty-sixth street), and that he meant to be prepared for him. He then asked the witness if he had a pistol, and was told that he had one at home. The defendant asked him to loan it to him, saying that he would give it back to him the next day, or some such expression as that. The witness then went to his home, got the pistol, and came back, having been gone probably two hours. He found the defendant at the saloon when he came back, and gave the pistol to him. At this time there was noticed on the defendant's chin a cut or scratch, described by the witness as not a very deep one, but at the bottom of the chin, plainly visible and seemingly recent. When the defendant received the pistol from the witness he asked the witness if it was loaded, and was told that it was not.

The witness on the stand swore distinctly and positively that the pistol was not loaded when he gave it to the defend-

ant; that he examined it before handing it to the defendant and knew it was not loaded. This was in the afternoon, about 4 o'clock, of July 5. As soon as the defendant received the pistol he went into the rear of the saloon behind a kind of partition, and was there heard to "click" the pistol a number of times. When he came out he was accompanied by the same person who came with him when he first entered the saloon, and they walked down street together and parted at the corner of Thirty-sixth street and Fourth avenue about 4 o'clock in the afternoon. There was time and opportunity to load the pistol when defendant was behind the partition. Just before they parted the defendant said to the witness that he meant to get "square," or "hunk," with the deceased. The witness told the defendant he had better not have any trouble with the deceased; that he was a bigger man than he was; that he had better take the black eye and have no more trouble, for he was known to be a pretty strong man. In the course of this conversation defendant told witness that Quinn had threatened to do him up every time he got him on the corner of Thirty-eighth street and Second avenue.

About twenty minutes or a quarter of five that same afternoon the defendant was seen on the southeast corner of Thirty-eighth street and Second avenue, and to walk across that avenue to the other or west side, where he stood a few moments looking towards Thirty-seventh street. Then he was seen to walk back to the east side of the avenue, where the witness lost sight of him, as she was going into a baker's shop near by; and within a very brief time after that the shooting took place on the corner of Thirty-eighth street and Second avenue, on the east side of the avenue.

The defendant's home was in First avenue, and could have been reached by him by going through any of the streets south of Thirty-eighth or Thiaty-ninth street, just as well as through Thirty-ninth street.

There is no evidence by any one who heard the conversation that took place between the parties at the time of the

shooting. Some of the witnesses were near enough to hear that it was an animated conversation, but could not detect the words.

The evidence of one witness was to the effect that he saw a person who turned out to be the defendant, raise his hand to fire at the deceased, who almost immediately fell, and the defendant then turned and walked, and subsequently ran, away. The person who was talking with the deceased on the corner of Thirty-eighth street and Second avenue just before the defendant came up, said that the deceased was standing with his back towards the south, or the direction from which the defendant was coming up Second avenue; that they were talking about the assault deceased had made upon the defendant the night before; that as witness was facing the deceased he saw the defendant coming up the avenue between Thirty-seventh and Thirty-eighth streets, and when the defendant was near or about to cross Thirty-eighth street he said to the deceased, "Here comes Lyon now;" that immediately deceased turned in the direction the defendant was coming and moved towards the curb-stone, the effect of which was to put himself in front of the defendant and to intercept his progress. Then there was, as has been stated, animated conversation, followed by the shooting, and without any assault having been seen to have been made by the deceased upon the defendant.

The defendant, as is stated, ran away and went to New Jersey and also to Pittsburg, and was finally arrested there on July 21, and brought back and lodged in jail in New York.

This evidence was substantially uncontradicted, except that the defendant was put upon the stand and claimed that the killing was done, first, in self-defense; second, that it was accidental. He testified that he did not believe the pistol was loaded when it was given to him by his friend, who stated to him that it was not loaded, and that he did not himself load it after he got it; that when he met the deceased he was on his way home, and endeavored to go by

without meeting him, but that when his presence was discovered by the deceased and when he stepped forward and intercepted the defendant, some conversation occurred of a threatening nature, and the deceased then assaulted him and cut his chin with a dagger or some sharp instrument and was proceeding to further assault him, when he called out to him to stop, that he was armed, and for the purpose of frightening the deceased, he drew the pistol and pointed it and fired, not supposing that it was loaded and with no intention of injuring the deceased; that he almost fainted as soon as he saw what he had done, and then started and ran away.

Various other contradictions of the testimony produced by the people were given by the defendant, and one witness was called by him who testified that after the affray or quarrel he saw the defendant walking away with his pocket handkerchief placed up against his chin, which was bleeding. This evidence the defendant claims was corroborative of his own testimony in regard to the assault having been made by the deceased upon him at the time of the shooting. From all the evidence in the case, carefully considered, it would seem quite plain that the defendant, instead of seeking his home, was engaged in watching the place where the deceased was accustomed to be, and was crossing the avenue from one side to the other, with the evident purpose of awaiting the arrival of the deceased; and when he appeared, the defendant, with the pistol in his pocket, started up the avenue with the intention of meeting him. The evidence made it plainly a case for the jury to determine as to the intention of the defendant in putting the pistol in his pocket and starting out for the vicinity where the deceased was accustomed to be. The careful examination which we have given the whole evidence in the case leads us to regard the verdict with entire satisfaction.

Aside from the fact that the defendant was on trial for a capital offense, which the jury might consider in weighing his evidence, the further facts appeared upon his exam-

ination, which the jury might also consider as bearing upon his credibility, that the defendant had been arrested when seventeen or eighteen years of age for an attempt to commit burglary, had pleaded guilty, and been sent to the Elmira Reformatory, where he spent some years; that in 1884 he was convicted of an attempt at burglary and sent to state prison; that he had been arrested numerous times for disorderly conduct; and during his flight after the killing in question he was arrested in Pittsburg for an attempt at burglary, and was in jail in that city when the officers from New York arrived and identified him.

The great weight of evidence upon the trial was with the people. There can be little doubt that the defendant, smarting under the beating which he had received the night previous, procured the pistol and started out in search of the deceased, with the intention of taking the law into his own hands and wiping out the insult by the destruction of the person who had been the cause of it.

Some exceptions were taken during the course of the trial which it is proper we should notice.

Counsel for the defendant argues that the testimony given in regard to what took place at the picnic, three or four weeks prior to the shooting, was improper and should have been excluded. We think not. It was the commencement of the history of the relations existing between the defendant and the deceased, which finally culminated in the shooting on the fifth of July. A quarrel between the two men began at the picnic, and being so short a time before the shooting, it was proper to show it.

Counsel for the defendant made several requests of the court to charge the jury, and it would seem that the court substantially complied with them. There are no exceptions to any alleged refusals of the court to charge, and there are no exceptions to the charge as made.

It is claimed, however, that the learned recorder erroneously instructed the jury in regard to the right of the defendant to arm himself, and that a new trial ought to

be granted on that account. It is claimed he in substance charged that the defendant would have no right, after the deceased had threatened him, to come to the place where the deceased might be, or to walk the streets in its vicinity; but that defendant's duty was to apply to the authorities and obtain the protection of the law. The difficulty with this is that the recorder gave no such charge. He did not state that an individual threatened by another with personal injury had no right to walk the streets or to go where the party making the threats might be; but that he must avoid meeting him or going through the streets where he might be and must call upon the law for his protection.

The learned recorder in his charge, when stating what might be regarded as excusable homicide, stated that " if the pistol was fired by the defendant intentionally, if he presented it against the person of the deceased intending to inflict injury upon him, then it is manifest it was not an accident, it was not a misfortune within the meaning of the law, and therefore it was not excusable. And even if it was by accident and misfortune, you must be further satisfied, before you can acquit on the ground that the homicide was excusable, that the prisoner was engaged at that time in doing a " lawful act by lawful means and with ordinary caution and without any unlawful intent." The recorder further stated in regard to the assault on the 4th of July that " if any wrong had been done to him, if he had been assaulted, as he claims he was upon that occasion and unjustly beaten and ill-used, it was his duty to apply to the public authorities, to resort to the law for redress if he had an opportunity to do so, but he would have no right to arm himself .and to go to the place where he expected to meet the man who had wronged and ill-treated him and inflict any bodily injury whatever upon him. That would be vengeance, and it is not doing a lawful act in a lawful manner."

Counsel for the defendant further argues that this charge holds the defendant guilty if defendant had unexpectedly

and without seeking the deceased met him, even if the pistol at the time had been accidentally discharged. No such construction can be given to it, and that was not the idea expressed. No fault can be found with the law as really laid down by the learned judge. The clear meaning was that no man can for any affront or insult that has been perpetrated upon him hours before arm himself with a deadly weapon and seek out the individual who committed the offense and then and there proceed to take the law into his own hands and punish the perpetrator of the wrong. And if while intent on such purpose he meets the individual upon whom he designs to wreak his vengeance, and before he is ready to fire the shot, and while the intent still exists, the pistol is accidentally discharged and his enemy killed, it cannot be said for one moment that the defendant was then engaged in doing a "lawful act by lawful means and with ordinary caution and without any unlawful intent," and that therefore the homicide was excusable.

The whole charge of the learned recorder was an exceedingly fair one. Every right of the defendant was carefully guarded, the law was accurately explained, and the question to be decided by the jury was presented to it in a clear, careful, and able manner.

We are satisfied that no exception taken by the defendant upon the trial is of any force, and we think the judgment entered upon the verdict should be affirmed.

All concur.

---

### NOTE UPON SELF-DEFENSE.

The most useful collection of cases upon this subject, together with exhaustive notes, is to be found in a work well known to the profession, "Select American Cases on the Law of Self-defense, by L. B. Horrigan and Seymour D. Thompson," St. Louis, 1874. This book takes in all the important cases in this country down to the time of its publication.

At page 33, in a note to the case of Commonweath *v.* Selfridge,

the authors give the following rules as to the duty of a person who is attacked :

"1. The obligation to retreat does not arise at all in ordinary cases ; but the assailed may stand his ground and repel force by force, using no more force than is necessary to accomplish his defense."

"2. It is only when the assault is so fierce, or when the combat waxes so hot that a choice of one of three things is forced upon the person defending,—either to retreat himself, or to suffer death or great bodily harm, or to kill his assailant,—that the question as to the duty of retreating arises at all. In other words, this question does not arise until it becomes a question whether one man shall retreat or another man shall die."

"3. In such cases : *a.* If the assault is manifestly felonious,—if it involves a known felony, such as rape, robbery, or murder,—the assailed is not obliged to retreat, but may kill the assailant instantly if the felony cannot be prevented by other means than retreating."

"*b.* But if the assault is non-felonious in its character,—as if only a moderate battery or trespass upon person or property is intended ; or if it be a mutual combat,—then the party defending must 'retreat to the wall,' if he safely can, before the law will excuse killing."

"4. A man being in his habitation is 'at the wall' and 'in his castle,' and is not obliged to retreat under any circumstances."

These rules do not entirely cover the whole subject, as will be seen from the following collection of recent authorities :

**What is the Right of Self-defense.**—The right of self-defense is simply the right to repel, by force, force unlawfully exerted, (and is derived, not from society, but is possessed by every man by the law of nature ; it cannot be superseded by the laws of society. Gray *v.* Combs (Ky.), 7 *J. J. Marshall*, 478 ; 23 *Am. Dec.* 431 ;) Lewis *v.* State, 51 *Ala.* 1.

**Justifiable Homicide in Defense of Person.**—"Homicide is also justifiable when committed in the lawful defense of the slayer or of his or her husband, wife, parent, child, brother, sister, master, or servant, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer, or to any such person, and there is imminent danger of such design being accomplished." *Penal Code*, § 205, subd. 1.

In addition to being the statute of our State, this is the general doctrine of the cases. Kingen *v.* State, 45 *Ind.* 518 ; Runyan *v.* State, 57 *Ind.* 80 ; People *v.* Anderson, 44 *Cal.* 65 ; People *v.* Morine,

61 *Cal.* 367 ; People *v.* Herbert, *Id.* 544 ; People *v.* Cochran, *Id.* 548 ; State *v.* Newcomb,. 1 *Houst. Crim. (Del.)* 66 ; State *v.* Hollis, *Id.* 24 ; State *v.* Vines, *Id.* 424 ; Davison *v.* People, 90 *Ill.* 221 ; State *v.* Bohann, 19 *Kans.* 28, 55 ; State *v.* Rose, 30 *Kans.* 501 ; Kennedy *v.* Commonwealth, 14 *Bush (Ky.)*, 340 ; Farris *v.* Commonwealth, *Id.* 362 ; Minturn *v.* Commonwealth, 79 *Ky.* 461 ; State *v.* Garic, 35 *La. Ann.* 970 ; State *v.* Matthews, 78 *N. C.* 323 ; Draper *v.* State, 4 *Baxter (Tenn.)*, 246 ; Holt *v.* State, 9 *Tex. App.* 571 ; State *v.* Abbott, 8 *W. Va.* 741 ; State *v.* Cain, 20 *W. Va.* 679. (All these were homicides in defense of the person of the slayer.)

The ancient doctrine as to the duty of a person assailed to retreat as far as he can before he is justified in repelling force by force has been greatly modified in this country, and has a much narrower application than formerly. The real question is : Did the defendant when assaulted believe, and have reason to believe, that the use of a deadly weapon was necessary to his own safety ? Runyan *v.* State, 57 *Ind.* 80.

To justify homicide the belief of danger must not only be honest, but reasonable. Holly *v.* State, 75 *Ala.* 14 ; Dolling *v.* Williams, 35 *Ohio St.* 58 ; Parker *v.* State, 55 *Miss.* 414 ; Kendrick *v.* State, *Id.* 436.

To justify killing in self-defense one need not be in terror. Arto *v.* State, 19 *Tex. App.* 126.

It is proper to instruct the jury that the defendant must himself have been without fault. Story *v.* State, 99 *Ind.* 413.

An officer is justified in shooting a person resisting him when the circumstances are such as would excite the fears of a reasonable man that the deceased intended to shoot the officer. Adams *v.* State, 72 *Ga.* 85.

A special officer accidentally shot the wife of defendant who was resisting arrest by shooting at the officer in the darkness. *Held*, that the rule that one defending himself from bodily harm apparently threatened by another is not liable for accidentally injuring a third person was applicable. Plumber *v.* State, 4 *Tex. App.* 310.

An aggressor cannot take advantage of the necessity of killing produced by his own wrongful act.

And this is so even though at the particular moment of killing the defendant was acting on the defensive. Eiland *v.* State, 52 *Ala.* 322 ; Leonard *v.* State, 66 *Ala.* 461 ; Tesney *v.* State, 77 *Id.* 35 ; State *v.* Hudson, 59 *Mo.* 136 ; State *v.* Peak, 85 *Id.* 190 ; State *v.* McDaniel (Mo.), 7 *S. W. Rep.* 634 ; State *v.* Davidson (Mo.), 8 *S. W. Rep.* 413 ; Gilleland *v.* State, 44 *Tex.* 356.

As for instance, if A. points a loaded pistol at B. and B. grapples

with him to prevent the shooting, A. cannot then shoot B. and allege he did so in self-defense. Clifford *v.* State, 58 *Wis.* 477.

If, on a trial for murder, the evidence of the prosecution shows that while the deceased was walking on the street unarmed one of the defendants fired a pistol at him from behind, and that the deceased then seized hold of him, and the other defendant came out of a building and shot him in the back, and that then the first named defendant shot him in the neck killing him, such evidence does not tend to show that the crime was manslaughter or that it was excusable or justifiable. People *v.* Ah Kong, 49 *Cal.* 7.

If A. without premeditation or express malice provokes a quarrel with B. and B. unexpectedly draws a deadly weapon, whereupon A. kills B., the homicide cannot be justified on the ground of self-defense ; it is manslaughter. Kinney *v.* People, 108 *Ill.* 519.

The rule that the aggressor cannot justify killing in self-defense is subject to the limitation that if the accused ceased to fight and withdraw in good faith from the conflict either by retreating or otherwise, the right of the attacked party to employ force ceases, and the right of the original aggressor to defend himself is revived, and if after that he find himself in apparent danger of death or great bodily injury, he has the same right to defend himself that he would have had if he had not originally commenced the encounter. People *v.* Wong Ah Teak, 63 *Cal.* 544 ; People *v.* Robertson, 67 *Id.* 646 ; Terrell *v.* Commonwealth, 13 *Bush (Ky.)*, 246 ; State *v.* Smith, 10 *Nev.* 106.

Where a person is assailed by another who attempts to take his life or inflicts great bodily injury and the assailed can secure safety by retreat then it is not necessary to take the life of the assailant to prevent the consummation of the felony attempted. People *v.* Druse, 5 *N. Y. Crim.* 10.

To support a plea of justifiable homicide it is necessary that the accused have retreated as far as he could with safety to himself; that the danger of death or grievous bodily harm to himself or to a person whom he was protecting must have been apparently imminent, and that his belief of the danger must have been honest and founded on reasonable grounds. United States *v.* King, 34 *Fed. Rep.* 302; Morrison *v.* State (Ala.), 4 *So. Rep.* 402.

Defendant, attacked by deceased, instead of seeking safety by drawing his head inside of a door, which he could easily have done, shot and killed deceased. Held, that these facts raised an issue as to murder only and not as self-defense or manslaughter. Thurman *v.* State (Tex.), 7 *S. W. Rep.* 236; Duncan *v.* State (Ark.), 6 *S. W. Rep.* 164.

To sustain such a defense the assailed person must have good reason to think and believe that at the time of the killing the danger was so urgent and pressing that to save his life or to prevent a felony on his person the killing of deceased was absolutely necessary; and it must also appear either that deceased was the assailant or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given. Styles v. State, 57 Ga. 183.

No one is excused for taking human life if with safety to his own person he could avoid it or retire from the combat. Judge v. State, 58 Ala. 406; McPherson v. State, 29 Ark. 225; Levells v. State, 32 Id. 585.

**Parricide may be Committed in Self-defense.**—One accused of parricide is entitled to the same protection of the law in acting in self-defense against his father as he would be in acting against any other individual, nor are the jury to give less weight to his exculpatory evidence where he produces it than if he had produced the same evidence having killed a stranger. People v. Walworth, 4 N. Y. Crim. Rep. 355.

**Words, however Insulting, or Opprobrious, do not Justify a Killing.**—No words, however insulting, will excuse a homicide. There must be peril to life or limb, or reasonable grounds to suppose that such peril exists, before the law will permit the taking of life under the excuse of self-defense. Evidence of opprobrious words or abusive language used by the person assaulted is good in extenuation only when the indictment is for an assault, assault and battery, or affray. Taylor v. State, 48 Ala. 180; United States v. Carr, 1 Woods, 480; Jackson v. State, 77 Ala. 18 ; Brown v. State, 58 Ga. 212.

**Mere Threats are not Sufficient.**—Mize v. State, 36 Ark. 653 : Roberts v. State, 65 Ga. 430 ; United States v. Outerbridge, 5 Sawyer (U. S. Circ. Ct.), 620 ; Jackson v. State, 6 Baxter (Tenn.), 452 ; State v. Harris, 73 Mo. 287. But threats accompanied by apparent intention of present felonious assault may justify killing.

If A. has, repeatedly, threatened to shoot B., and B. kills A. in the act of drawing a pistol upon him, instantly, where he has no other probable means of protecting himself or getting out of the way, it is a case of justifiable homicide. State v. Rhodes, 1 Houst. Crim. (Del.) 476.

A person is not justified in killing one who threatens him, unless there are circumstances to show that that person was then and there about to harm the person threatened. Proof that B. had formerly threatened to kill A., had lain in wait and had shot at him, is insufficient. Parsons v. Commonwealth, 78 Ky. 103.

If A. is apprised of threats by B. against A.'s life, and B. by any act manifests an intention to execute the threats, A. may act on appearances and resort to any means to protect himself, and the consequent killing of B. would be justifiable. Sims *v.* State, 9 *Tex. App.* 586.

When a person comes into the presence of another having threatened his life, and does acts indicating an intention to take that life, the party has a right by putting himself on his guard not only to consider the present acts, but to give character to those present acts through the medium of the antecedent threats. People *v.* Walworth, 4 *N. Y. Crim. Rep.* 355.

Where it was shown where the accused and the deceased had quarrelled on the day previous to the killing, and that when they met on the day of the killing the accused advanced upon the deceased in a threatening manner,—*Held,* that the deceased could strike in anticipation, provided he did not employ any unreasonable force in repelling the assault, and such blow would be in self-defense. And such blow, though the first struck is not greatly disproportioned to the peril, will neither excuse or mitigate the killing, and in such a case the previous state of feeling between the parties, or the fact that the deceased had made threats, should exert no influence on the decision of the case unless there were some present impending purpose, real or apparent, to carry out such threat. Myers *v.* State, 62 *Ala.* 599.

A prior assault or threats may justify one in acts of self-defense of personal property when attacked by the same person, not otherwise justifiable. Cahill *v.* People, 106 *Ill.* 621.

A person assailed must decide for himself, but at his legal peril, whether the circumstances of the assault warrant such apprehension of immediate danger to his life or limb as to justify him in killing his assailant. Threats of a dangerous man when unarmed and doing nothing indicating execution of his threats, do not warrant such apprehension. Williams *v.* State, 2 *Tex. App.* 271.

Where the prisoner had been threatened, waylaid, and assaulted by the deceased, and afterwards casually met and killed him. *Held,* that he was justified if, from deceased's character and antecedent conduct and circumstances of the meeting, he had reasonable ground to believe that he could only protect himself by so doing. Oder *v.* Commonwealth, 80 *Ky.* 32.

The right of self-defense is not impaired by mere preparation of a wrongful act unaccompanied by any demonstration, verbal or otherwise, indicative of the wrongful purpose. Cartwright *v.* State, 14 *Tex. App.* 486.

On a trial for killing a stranger upon his roughly and suddenly awakening defendant, evidence is competent to show that the defendant had always been a somnambulist, had recently lost much sleep and had recently had his life threatened by another than deceased. Fain *v.* Commonwealth, 78 *Ky.* 183.

**Insults by Drunken Man.**—Where A. kills B. on mere provocation by words the jury may consider the fact that B. was drunk when he uttered the words in determining whether there was an excuse for A.'s assault on B. Harris *v.* State, 34 *Ark.* 469.

**Defense of Home or Property.**—Homicide in defense of one's property is justifiable when necessary to defeat or prevent a felonious aggression thereon (People *v.* Flanagan, 60 *Cal.* 2), or the person whose home is attacked believes the killing to be necessary to repel the assailant. State *v.* Peacock, 40 *Ohio St.* 233.

One is justified in shooting a person who in the night time breaks into a house occupied by him, with intent to commit a felony. State *v.* Horskin, 1 *Houst. Crim. (Del.)* 116.

A man was attacked after dark on his own premises, where were his wife and family, by a powerful, resolute, and drunken man whom he in self-defense, killed. *Held*, that if he believed with reason that it was necessary to kill his assailant for the protection of his own life or to save himself from great bodily harm, it was an excusable homicide, and that he was under no obligation to flee or call for the interference of bystanders; that he might show by others that the conduct of the deceased at the time of the killing had been so violent as to alarm them, and also what was the behavior of the deceased on his way to the place where the homicide was committed. People *v.* Lilly, 38 *Mich.* 270; Brownell *v.* People, *Id.* 739.

Where a husband on entering his house detects his wife in suspicious circumstances with a paramour, and thereupon enters into a fight with him, standing not entirely upon the defensive, and kills him, it is at the most manslaughter; or if he stands upon the defensive and does not fight until he is attacked and threatened with death or great bodily harm, when to save himself he kills his assailant, it is excusable homicide, even if the other does not turn and flee out of the house. State *v.* Harman, 78 *N. C.* 515.

A party has the right to use a deadly weapon in the necessary defense of his office even to the extent of taking the assailant's life. Morgan *v.* Durfee, 69 *Mo.* 469.

The right of a person when attacked in his own house not to retreat is applicable in a case of altercation between partners in a place of business. Jones *v.* State, 76 *Ala.* 8.

A person assaulted in his own house cannot even then kill his assailant unless it is necessary to protect himself or home. State *v.* Middleham, 62 *Iowa*, 150.

Where a person in possession of a well by permission of the owner, has enclosed it, he need not have the exclusive right to its use in order to have the right to repel by force an attempt to invade his possession. It is sufficient if he has such right as against an intruder attempting to use it. Roach *v.* People, 77 *Ill.* 25.

**Defense of others.**—The right of self-defense may be exercised in behalf of a brother, but if the brother provoke the assault he must, before that right can be exercised, retreat as far as he safely can. State *v.* Greer, 22 *W. Va.* 800.

Where two brothers are in fault in uniting and bringing on an affray, the rule that a brother may take life in defense of his brother has no application. Smurr *v.* State, 105 *Ind.* 125.

Where one interferes to protect another he may not kill unless the life or person of him who it is sought to protect is in peril. Risby *v.* State, 17 *Tex. App.* 517.

The right of defense cannot be exercised to protect an absent person. People *v.* Walworth, 4 *N. Y. Crim. Rep.* 355.

**Mutual combat.**—An instruction that in a mutual combat where both parties are in the wrong both are responsible for the result of their acts and one cannot claim anything on the ground of self-defense until he has first withdrawn and retreated as far as he can in safety, and clearly evinced to his adversary his intention to do so, is erroneous for the reason that the rule requiring the intention to withdraw clearly is too strictly laid down. If the defendant gives his adversary reasonable ground for thinking he has withdrawn, this is sufficient. State *v.* Dillon (Iowa), 38 *N. W. Rep.* 525. And see also Burgess *v.* Territory (Montana), 19 *Pac. Rep.* 558.

A homicide, even if committed upon sudden combat, is not excusable if undue advantage was taken of the deceased. People *v.* Perdue, 49 *Cal.* 425.

**When the right of self-defense commences and ends.**—A person threatened with attack may lawfully, in the exercise of the right of self-defense, strike first. State *v.* Mc Donald, 67 *Mo.* 13.

A man about to be assaulted with a deadly weapon is not required to wait until his assailant is upon equal terms with him before he can lawfully slay him. Fortenberry *v.* State, 55 *Miss.* 403.

A party assailed and endangered in life and limb is not bound to retreat, but may pursue his adversary till the danger is past, and if in so doing a conflict ensues and he kills his adversary, the killing is justifiable. West *v.* State, 2 *Tex. App.* 460.

One attacked with a felonious intent may resist to the extent of taking the assailant's life; he is under no obligation to retreat. But one attacked without felonious intent mnst retreat if he can before he can justify killing his adversary. State *v.* Dickson, 75 *N. C.* 275. See also Erwin *v.* State, 29 *Ohio St.* 186.

When protection is achieved the legitimate end of the force allowed to be resorted to in self-defense is accomplished and should then cease. Lewis *v.* State, 51 *Ala.* 1.

Though defendant was expecting à difficulty with deceased his right to defend himself did not arise until he had done everything in his power to avoid the necessity. State *v.* Johnson, 76 *Mo.* 121.

**Reasonable Appearance, not Actual Danger, the Test.**—To justify a homicide in self-defense the danger need not be actual if the accused acted on a reasonable appearance and belief of danger. This general proposition is supported by Murray *v.* Commonwealth, 79 *Pa. St.* 311; Roach *v.* People, 77 *Ill.* 25; Holloway *v.* Commonwealth, 11 *Bush (Ky.)*, 344; Steinmeyer *v.* People, 95 *Ill.* 383; Panton *v.* People, 114 *Id.* 505; Jordan *v.* State, 11 *Tex. App.* 435; Smith *v.* State, 15 *Id.* 238. But see Eiland *v.* State, 52 *Ala.* 322; Erwin *v.* State, 43 *Tex.* 236.

The surrounding circumstances, not the degree of force used in an assault, is the test of the right of self-defense. Williams *v.* Commonwealth, 80 *Ky.* 313.

If a gun be pointed at one in a threatening manner under such circumstances as to induce a reasonable belief that it is loaded and will be discharged and thereby produce death or inflict great bodily harm on the person threatened, he will be justified in using whatever force may be necessary to avert the apparent danger; his right is not affected by the fact that the gun was not loaded. People *v.* Anderson, 44 *Cal.* 65.

Where the actions of deceased were such as to lead defendant to suppose he intended to use deadly weapons, though in fact he was unarmed, of which defendant was not aware, the killing was justifiable. State *v.* Potter, 13 *Kan.* 414; Bang *v.* State, 60 *Miss.* 571.

Where defendant addressed deceased in a peaceful manner and the latter replied angrily and insultingly, and approached him with his hand at his pistol-pocket as though to draw and fire, defendant was justified in firing first, though it subsequently appeared that deceased had no weapon. Dearman *v.* State, 71 *Ala.* 351.

Self-defense cannot be made to depend upon whether or not a gun is or is not loaded, or will or will not shoot, unless it appears that the party upon whom it was attempted to be used knew that it was not

loaded or that it would not shoot. Bode v. State, 6 *Tex. App.* 424.

If one believes, and there is reasonable ground to believe, that another has sought him out for the purpose of killing him or doing him great bodily harm and that he is prepared therefor with deadly weapons, and the latter makes demonstrations and manifests an intention to commence an attack, the former is not required to retreat, but has the right to stand and defend himself, and even pursue his adversary until he has secured himself from danger; and if in doing so it is necessary or upon reasonable grounds appears to be necessary to kill his antagonist, the killing is excusable upon the ground of self-defense. Holloway v. Commonwealth, 11 *Bush (Ky.)*, 344.

There being evidence that the deceased was a turbulent character, that defendant had had a quarrel with him, and that deceased had seized his pistol when the homicide was committed, justified defendant in killing deceased if he had reasonable grounds to apprehend immediate danger, though in fact deceased intended no harm. State v. Eaton, 75 *Mo.* 586.

Under circumstances which might have induced the belief that a man was cutting the throat of his wife, their son shot and killed his father. On the trial of the son for murder, it was held that if the accused had reasonable grounds for believing, and honestly did believe, that his act was necessary for the defense of his mother, the homicide was excusable. Reg. v. Rose, 15 *Cox C. C.* 540.

A bare fear of the commission of a felony is not sufficient to justify a killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing acted under the influence of those fears. Thompson v. State, 55 *Ga.* 47; Palmer v. State, 59 *Ark.* 248; Wall v. State, 51 *Ind.* 453; State v. Stockton, 61 *Mo.* 382. There must be some overt act indicative of imminent danger at the time. Stoneman v. Commonwealth, 25 *Gratt. (Va.)* 887.

**Conspiracy to Take Life.**—Conspiracy to take life and an attempt to carry it into effect do not, without more, justify the taking of the life of the person thus attempting. Henderson v. State, 77 *Ala.* 77.

**Mere Assault and Battery does not Justify Homicide.**—The mere raising of a stick to strike, though the stick be capable of producing death, does not justify the killing of the assailant. Worthan v. State, 70 *Ga.* 336.

Peril of a mere indignity to the person, or of a battery from which great bodily harm cannot reasonably be apprehended, will , not justify the taking of life, although such peril could not be

escaped by retreat, or the danger of it would thereby be increased. Eiland *v.* State, 52 *Ala.* 322.

Whether the use of a deadly weapon is justifiable depends on whether the person using it has reasonable grounds to believe himself to be in imminent peril of receiving great bodily harm. The mere fact that he has been struck by his assailant first is not sufficient. Davis *v.* People, 88 *Ill.* 350.

A mere blow with the hand, unaccompanied by anything to evince a design to kill, or to do great bodily harm, does not create an exigency which can justify the person assaulted in shooting the assailant, even though the former first retreats, and the latter does not show any abandonment of the conflict. State *v.* Rogers, 18 *Kans.* 78.

**Threatening Motion.**—No motion that a man can make in throwing his hand behind him, or putting it on a shelf to get a pistol, will justify killing him, unless the circumstances show that he intended to shoot. Bailey *v.* State, 70 *Ga.* 617.

On trial for murder, proof that after the deceased had threatened the accused with great bodily harm they met without design, the motions of the deceased gave the accused reasonable ground to believe that he was about to execute the threat, the killing was done under the belief that it was necessary in self-protection, will justify an acquittal. State *v.* St. Geme, 31 *La. An.* 302.

On trial of I. for murder of C., held· that I., holding a loaded gun pointed at C., who was not advancing, was not in imminent peril of life or limb, although C. had an open knife in his hands. Ingraham *v.* State, 67 *Ala.* 67.

**Excessive Resistance.**—Homicide by excessive resistance to an assault, even when cruel, ·is not always murder. If inflicted pursuant to a formed design, if there be other satisfactory evidence of premeditation, then this is murder. On the other hand, if the resistance be not greatly disproportioned to the assault, and death ensue by misadventure, this is self-defense. If there [is excessive resistance, and a fatal blow be inflicted in the heat of blood, although with a deadly weapon, and there be no evidence of previous malice, formed design, or of such deliberation as to show that reason held sway, it is manslaughter. Judge *v.* State, 58 *Ala.* 406.

The fact of the deceased putting his hand to his hip as though to draw a pistol, when he was driving by a store and saw defendants in the door-way, does not justify their following the wagon and firing upon him, and when he jumped to the ground shooting and stabbing him till he died, as the apprehension caused by the threat-

ening gesture must have been dissipated before the killing.    Guiceo
v. State, 60 *Miss.* 714.

**A Thief Cannot be Unnecessarily Killed.**—A mere attempt to
commit a larceny is not a felony under the Tennessee Code, para-
graph 4,630, and the owner is not excused in killing the trespasser in
the act.    March v. Borum, 57 *Tenn.* 87.

A person guilty of a misdemeanor, and fired on by a policeman
while avoiding arrest, may repel such attack in self-defense by re-
turning the fire, and if, in so doing, he kills the officer, such killing
is not necessarily unlawful.    Tiner v. State, 44 *Tex.* 128.    Compare
James v. State, *Id.* 314.

One who has stolen a horse and is running away with it has a
right to defend himself from the owner's attempt to kill him, and if
in self-defense he kills the owner, he is entitled to have the law gov-
erning homicide in self-defense expounded to the jury.    Luria v.
State, 12 *Tex. App.* 257.

**What are Questions for the Court and Jury Respectively.**—
Where a homicide is admitted, the question of whether there is jus-
tification is for the jury.    People v. Young, 64 *Cal.* 212.

Of the reasonableness of the danger the jury are to judge, but
the threats and the attending circumstances must be such as to force
upon the mind of a reasonable man the belief that he is in imminent
danger.    State v. Bohan, 19 *Kans.* 28, 55.

Of the imminency of the danger and the necessity of taking life,
the assailed party must judge at his peril, but if the jury, viewing
the circumstances from his standpoint at the time, believe his con-
duct to have been justifiable, he is excusable.    State v. Cain, 20
*W. Va.* 679.

On trial for murder, where the killing is averred to have been in
self-defense, it is for the jury to determine whether the danger was
such as to require the accused to kill the deceased in order to save
his own life, or to protect himself from serious bodily injury.    Lis-
ter v. State, 3 *Tex. App.* 17.

Apparent danger is a legal term, with a fixed and definite mean-
ing.    What circumstances constitute apparent danger is primarily a
mixed question of law and fact, but where all the facts are ascer-
tained, it is a question of law alone.    Long v. State, 52 *Miss.* 23.

**Instructions to the Jury.**—On the trial of the defendant, charged
with murder in the first degree, when the evidence shows that the
accused was not forced to take the life of the deceased in order to
save his own life or limb from serious peril, and had no reasonable
cause to entertain a belief of such a necessity to take life, an instruc-

tion which ignores the excuse of self-defense is not erroneous. Taylor v. State, 48 *Ala.* 180.

On the trial of one for murder, in shooting a highway commissioner who was attempting to pull down the defendant's fence, an instruction that the deceased was a trespasser, and that the defendant had the right to use force in preventing the trespass,—*Held*, to have been properly refused. Davison v. People, 90 *Ill.* 221.

A person committing homicide is excusable if he does it under a *bona fide* belief that it is necessary to protect the life of himself or another, and an instruction confining the excusability to actual necessity, and excluding reasonable appearances is error. Stanley v. Commonwealth (Ky.), 6 *S. W. Rep.* 155. Also State v. Jones (S. C.), 7 *So. East. Rep.* 296.

On a trial for murder, where the defense is that the act was committed in self-defense, and the purpose to kill is not so much in issue as the necessity of the killing for self-protection, an instruction to the jury, in substance, that the crime was murder if the defendant had the purpose to take life, given without qualification, is erroneous. Bergen v. People, 26 *Mich.* 162.

On a trial for murder, instructions that "if the defendant himself brought on the fight; and went into it armed, he cannot justify killing his adversary." *Held*, erroneous. People v. Bush, 65 *Cal.* 129.

It is error to instruct the jury that in order to justify one in killing another in self-defense it must appear that in order to save his own life or prevent his receiving great bodily harm, the killing was absolutely necessary. People v. Flahave, 58 *Cal.* 249.

Instructions that defendant might kill in self-defense if "he had reason to believe that he was in danger of great bodily injury, or of his life,"—*Held*, erroneous, as justifying the killing, though there might have been other modes of avoiding the danger. State v. Shelton, 64 *Iowa*, 333.

A charge which postulates, as one of the elements of self-defense, real intent on the part of the assailed to take life, if he does some grievous bodily harm to the assailant, is erroneous. Such intent may not exist in fact; if it is evident by a present act or demonstration inducing in the mind of the slayer a reasonable belief that the danger to his life or person was them imminent, this is enough. Rogers v. State, 62 *Ala.* 170.

Instructions in a trial for murder that in order to rebut the presumption of malice from the killing, defendant must show circumstances of justification "to the satisfaction of the jury," and to establish the plea of self-defense must show that he was in actual

danger,—*Held*, erroneous. Ingram *v.* State, 62 *Miss.* 142. Compare Dawson *v.* State, *Id.* 241; Bishop *v.* State, *Id.* 289.

On a trial for murder, the evidence tending to show that the accused had reasonable cause of apprehension that the deceased was about to do him great bodily harm, a charge to the jury limiting the justification to the fear of death,—*Held*, to be erroneous. Cheek *v.* State, 4 *Tex. App.* 444.

**Evidence.**—The law of self-defense is the same in civil as in criminal actions, with the exception of the rule of evidence which in criminal actions gives the defendant the beuefit of a reasonable doubt. That doubt, however, is as to the fact; not as to the extent of the right. March *v.* Walker, 48 *Tex.* 372.

As to what evidence is sufficient to sustain a plea of self-defense, see United States *v.* King, 34 *Fed. Rep.* 302; Cannon *v.* State (Ga.), 7 *So. East. Rep.* 140; State *v.* Jones (S. C.), *Id.* 296; Humphries *v.* State (Tex.), 7 *S. W. Rep.* 663.

In considering whether the accused, in perpetrating the killing, acted upon the belief that there was reasonable ground to apprehend a design to commit a felony or do some great personal injury, and imminent danger of such design being accomplished, the jury are to take into consideration the fact, if it be in the case, that the deceased was invited by the accused to the interview in which the killing took place. People *v.* Walworth, 4 *N. Y. Crim. Rep.* 355. The true rule in such case is that where the invitation comes from the persou who kills, and the person killed is brought into his presence and there slain while alone, there being enmity between them, or there having been threats on the part of the person killed against the accused, a careful investigation by the jury is reqnired to see whether or not the person who slays was in the position required by the statute in order to justify the offense. *Id.*

In such case the jury have a right to look at antecedent threats that are alleged to have been made against the prisoner, for the purpose of determining whether his mind in reaching those conclusions was operated upon by those threats, and the threats were of such a character as may justly be said to have justified his mind in reaching more readily the conclusion which justified the killing under the statute. *Id.*

Proof of the reputation of the assailant for quarrelsomeness, etc., is only admissible when the assault was such as to justify killing in self-defense or to prevent great impendiug or imminent danger of bodily harm. Abbott *v.* People, 86 *N. Y.* 460.